COMMONWEALTH *vs.* EDWARD P. O'TOOLE.

Suffolk.    October 3, 1966. — January 26, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Evidence,* Admissions and confessions, Relevancy and materiality, Credi-
bility of witness, Of other offence. *Constitutional Law,* Admissions and
confessions, Assistance of counsel. *Practice, Criminal,* Assistance of
counsel; Exceptions: whether error harmful. *Error,* Whether error
harmful.

The principles set forth in *Miranda* v. *Arizona,* 384 U. S. 436, were not to
be applied in a Massachusetts criminal case tried before the date of the
*Miranda* decision.    [630]
Where the defendant in a criminal case, while at a conference with prose-
cuting officials, was in no way physically detained or restricted, although
his attention was directed to circumstances appearing to call for an
explanation by him and it was stated to him that a prosecution seemed
to be required and he was asked to show why it was not required, there
was no "custodial interrogation" and the fact that the defendant did
not have counsel present at the conference did not preclude use of what
was said there at his trial.    [631]
At the trial of a former city official for larceny from the city and related
offences, inquiry of him on cross-examination to show that he had made
no effort to check certain vouchers was not precluded by the facts that
before the time referred to in the inquiry he had resigned his city office
and any checking of the vouchers would require permission of the city
officials then having custody of them.    [631–632]
Evidence that the defendant in an indictment for larcenies committed over
a certain period had deposited large sums of money in banks during
that period was admissible at his trial.    [632–633]
At the trial of an indictment for larcenies over a certain period, where
there was evidence that during that period the defendant had deposited
large sums of money in bank accounts and his wife had testified that
her father, later deceased, had given her substantial amounts in cash
during such period and that she had given the money to the defendant
to deposit, there was no reversible error in allowing the prosecutor to
elicit from her in cross-examination that she had not filed a gift tax
return as executrix of her father's estate [633–635]; SPIEGEL, J., dis-
senting.
Certain references by the prosecutor in his argument to the jury at a
criminal trial were not prejudicial in view of timely and appropriate
instructions by the judge to the jury.    [635–636]

FOUR INDICTMENTS found and returned on February 12,
1964, and March 12, 1964.

The cases were tried in the Superior Court before *Paquet, J.*

*Joseph J. Balliro* for the defendant.

*John T. Gaffney,* Assistant District Attorney, for the Commonwealth.

WHITTEMORE, J. The defendant was found guilty by a jury in the Superior Court under four indictments charging him respectively with fraudulent conversions, obtaining signatures under false pretences, larceny of amounts exceeding $100, and uttering forged instruments. The trial was subject to G. L. c. 278, §§ 33A–33G. The assignments of error now argued relate to the judge's rulings on evidence and his ruling on an objection to the Commonwealth's closing argument.

Certain facts are undisputed. The defendant was city manager of Revere from January, 1953, to December, 1963. From 1959 to 1961, fifty-four checks were issued to City Hardware, Inc. for a total sum of $44,482. The checks were issued upon requests from the building and remodeling department. City Hardware, Inc. did not receive the checks nor the proceeds and did not deliver to the city any of the materials for which the checks purportedly were issued. The indorsements on the checks were not genuine.

There was evidence that the defendant was the head of the building and remodeling department from 1959 to 1961, that the checks had been drawn to City Hardware, Inc. at the defendant's request, and that, contrary to the customary procedure, they had been delivered to the defendant personally. The defendant had then caused the checks to be cashed in the city tax collector's office and the proceeds also delivered to him. The indictments followed an extended investigation that began in 1962 when a number of taxpayers presented a petition to the district attorney under G. L. c. 44, § 62.[1]

---

[1] "Section 62. Any city, town or district officer who knowingly violates, or authorizes or directs any official or employee to violate, any provision of this chapter, or any other provision of general law relating to the incurring of liability or expenditure of public funds on account of any city, town or district, or any provision of special law relating to the incurring of liability or

1.  The defendant contends that the admission in evidence of conversations occurring in the course of the investigation between November 5, 1962, and October 17, 1963, violated his constitutional right to counsel. The testimony as to the conversations was given by William J. DiGiuseppe, a detective of the Metropolitan District Police, who was assigned to the district attorney's office. The testimony tended to support the charges of the indictments.

On November 5, 1962, at the defendant's City Hall office, DiGiuseppe asked the defendant for an "explanation for his overspending" in the city budget. The defendant said he would explain on November 16 at the district attorney's office, and suggested that the petitioners were disgruntled job seekers. Testimony concerning the November 16 meeting and several subsequent meetings was excluded.

On August 1, 1963, at the defendant's office, the defendant said he had personally handled the building and remodeling account as to all matters from 1958 through 1963; he alone was responsible for each requisition to buy goods and services from the account and he had followed the required procedures. DiGiuseppe asked for the defendant's books for that account and requested that he "explain the transactions concerning" the account. The defendant replied, "that was a big order for him to do." DiGiuseppe said that if he kept such good records he should be able to lay hands on them right away and asked for a chance to look over the records. The defendant said "he didn't have them right then and there."

On October 17, 1963, again in the defendant's City Hall office, DiGiuseppe told the defendant that the district attorney's office ("we") would soon be asking the city treasurer for the cancelled checks. The defendant said that if the treasurer turned over any checks to the district attorney's office, "he's in for a lot of trouble" and that the defendant

---

expenditure of public funds as aforesaid, shall, except as otherwise provided, be punished by a fine of not more than one thousand dollars or by imprisonment for not more than one year, or both; and the mayor, selectmen, prudential committee, or commissioners, shall, and five taxpayers may, report such violation to the district attorney who shall investigate and prosecute the same."

had ordered the treasurer "not to give . . . [the district attorney's office] anything." The investigator asked where the defendant kept his copies of the building and remodeling transactions, and he replied that he destroyed his copies once a warrant was issued by the auditor's office, as he did not need them.

The defendant relies also on other testimony, summarized in this paragraph, that was either struck or excluded on voir dire, but which informed the judge as to the nature of the investigation. On November 16, 1962, at a conference at the district attorney's office, an assistant district attorney asked for the defendant's "defence" for this overspending, saying it would also be his own "defence" if the petitioners sought a writ of mandamus to compel him to take action under G. L. c. 44, § 62. He asked the defendant "to give him a reason why he should not prosecute." The defendant said he had knowingly spent the money and thought he had a right to do so, borrowing from one account or another when he had money in the excess and deficiency account. In subsequent conversations, reference was made by the interrogator to the "long promised report," the report looked for "since Thanksgiving," the report asked for "over six months" ago. On one occasion the defendant asked "what report that was" and DiGiuseppe asked "if he was kidding."

The defendant relies on *Escobedo* v. *Illinois,* 378 U. S. 478, 490–491, and *Miranda* v. *Arizona,* 384 U. S. 436, 444, and contends, in effect, that the compulsion of the investigation brought him within the rule requiring counsel in custodial interrogation because it deprived him of his freedom of action. We disagree.

The trial of the instant case began on July 19, 1965, after the date of the *Escobedo* decision (June 22, 1964) but before the date of the *Miranda* decision (June 13, 1966). The *Miranda* case explained and expanded the constitutional rule as stated in the *Escobedo* case. We do not apply the *Miranda* principle retroactively. *Commonwealth* v. *McGrath, ante,* 534, 539, and cases cited. See *Johnson* v.

*New Jersey,* 384 U. S. 719. But even under the rule as explicated in the *Miranda* case the validity of the inquiry would not depend on the presence of counsel. In that case the court held that counsel is required in any "custodial interrogation" and defined the term as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U. S. 444. In a footnote the court commented, "This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused."

The defendant O'Toole was in no way physically detained or restricted. Calling a suspect's attention to circumstances that appear to require an explanation does not deprive him of his freedom of action. There was no restraint of freedom in interviewing the defendant in the district attorney's office. Stating, in effect, that the circumstances appear to require prosecution and asking that the defendant show why they did not, was not restraint. The defendant's conduct in the course of the investigation undoubtedly greatly enhanced the suspicions of the interrogators and tended to suggest violations not only of G. L. c. 44, § 62, but of other statutes. That was not enough to require the presence of counsel. It was not coercion or restraint to give the defendant full opportunity to decide whether, in the light of what was known, he cared to talk. *United States* v. *Knight,* 261 F. Supp. 843 (E. D. Pa.). *United States* v. *Spinney,* 264 F. Supp. 774 (D. Mass.).

There is nothing in the defendant's suggestion that, because of the absence of counsel, it is "implicit" that his answers were not made voluntarily.

2. It was not error to admit in evidence the following cross-examination of the defendant: Q. "Did you do anything to check out these bills to determine whether or not these materials had been furnished at that time, after your attorney showed you the bills?" A. "No."

The defendant objects that, as he had resigned as city manager in December, 1963, he was not in a position in July,

1965 (the time referred to in the question), to make the investigation suggested. The jury knew the date of the defendant's resignation and also heard his testimony that he had first learned that materials had not been furnished to the city about a week prior to taking the witness stand, i.e., in July, 1965, shortly after the Commonwealth had furnished copies of the checks and bills to defence counsel pursuant to an order of the court. Obviously any checking would have required permission of city officials having custody of the records. That did not render irrelevant the absence of any effort in the premises.

3. No error is shown in the admission of testimony that in 1959 through 1961 the defendant deposited $69,362.39 in bank accounts held jointly with his wife and $2,283 in his individual account. The Commonwealth had cross-examined the defendant as follows: Q. "Did you get any of that $44,482, Mr. O'Toole?" A. "No, sir." Q. "Did you deposit any of the $44,482 in any bank account?" A. "No, sir." Q. "Exclusive of your salary, Mr. O'Toole, can you tell us, sir, did you deposit $44,000 in any bank?" A. "No, sir." Q. "And you still want to leave it that you did not deposit $44,000-odd between the years 1959 to 1961 in the National Shawmut Bank?" A. "I will have to total up what I deposited in those years." Q. "Was it close to $44,000?" A. "I have no idea; I would have to check it."

The judge admitted the evidence concerning the bank accounts for the limited purpose of impeaching the defendant's credibility, and, shortly after the admission of the evidence, so instructed the jury. The defendant's testimony was reasonably construable as an assertion that, apart from his salary, he did not deposit as much as $44,000 in any bank and that he had no idea without totaling his deposits whether what he did deposit was close to that sum. Thus there was a narrow basis for the admission, to impeach credibility, of the evidence of deposits much larger than $44,000.

The evidence was, however, otherwise admissible. In Commonwealth v. Mulrey, 170 Mass. 103, 110–111, we held

that evidence of bank deposits by a defendant, in an amount too large to be accounted for by his salary, was admissible in connection with independent evidence tending to show a successful fraudulent conspiracy. "The evidence by itself of course did not prove criminal conduct. But it is not necessary that every piece of evidence admitted should be sufficient by itself to prove the crime. Evidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and in turn may corroborate the conclusion which would be drawn from the other facts." See *Commonwealth* v. *Nassar, ante,* 37, 48. Hence, assuming that the evidence of the deposit of substantial sums in the years 1959 through 1961 may have caused the jury to draw inferences as to the defendant's guilt, contrary to the judge's instruction, no error is shown, for the evidence was rightly available for that purpose.

4. The defendant contends that there was error in the cross-examination of the defendant's wife: Q. "Can you remember — did you file a gift tax return on your father's estate?" Defendant's counsel: "I object." THE COURT: "With respect to this money you are now inquiring about?" Assistant district attorney: "Yes, your Honor." THE COURT: "I am going to permit it. . . . [Defendant's exception.]" THE WITNESS: "No, I didn't."

Mrs. O'Toole had testified that her father had died in December of 1964 and she was his executrix. He had income from an invention, had no checking account, and had given her substantial sums of money to be spent for herself and her family or for him. In the years 1959 through 1961 he had given her substantial sums which she had given to her husband to deposit in their joint accounts. Her father had given her in each of the years 1959 and 1960, "[a]round $16,000" and in 1961 around $23,000.

On cross-examination Mrs. O'Toole testified that the gifts were in cash. To get together the figures, she had, on the previous evening, gone through the checking account with the defendant and his counsel. She had filed an inventory of her father's estate; she believed she had filed a bond. There followed the testimony as to the gift tax return.

Cross-examination continued, in the course of which the district attorney asked whether her father had filed a gift tax return or the witness had done so. The court excluded these inquiries.

We reject the defendant's contention that, because of an implication of an offence by the witness against the tax laws, the subject was beyond the scope of cross-examination. There was no such implication in the question. The Commonwealth was not seeking to discredit the testimony by suggesting that the witness was a law violator. The adverse impact on the defendant of Mrs. O'Toole's answer that as executrix she had not filed a return was to discredit her explanation of the large bank deposits. The possible implication was that, had there been a gift, the executrix would have filed a return and not risked whatever penalty the law imposed. Only if the jury, notwithstanding the implication, believed that there had been a gift, as the defendant wished them to do, could they have had a basis for suspecting the witness of default under the tax laws. This of course could not harm the defendant. Compare *Commonwealth* v. *Valcourt,* 333 Mass. 706, 717–718.

The defendant in his brief argues no other basis for excluding this testimony than the alleged application of the *Valcourt* case. In the circumstances there is strong ground for applying Rule 13 of the Rules for the Regulation of Practice before the Full Court, 345 Mass. 787. Nevertheless, we have considered whether there was prejudicial error in admitting the evidence and conclude that there was not.

The judge undoubtedly made his ruling in recognition of the obligation of a legal representative of a deceased person to pay all debts and the consequent possibility or likelihood that, if returns had not been made for the years of the gifts, there would be an obligation on the executrix to make one. He may also have had in mind the applicable regulation.[2]

---

[2] Treasury Reg. § 25.6019–1 (b): ''If the donor dies before filing his return, the executor of his will or the administrator of his estate shall file the return.''

We do not deem it important that there was such a regulation or that the judge may or may not have been aware of it. The ruling opened the subject for inquiry for the defendant as well as for the Commonwealth.

The most likely inference, as the matter was left, was that the executrix, if she had received the gift, *might* have been under an obligation. The defendant, however, was not obliged to leave before the jury a basis for any materially adverse inference. He could have asked the witness if she had received any information or intimation from any source that she might be under any obligation to file a return. If, as the defendant contended, the gifts had been made, it seems most unlikely that further questioning of the witness to show why no return had been filed could have been prejudicial to the defendant. In any event, the defendant could have asked the judge to instruct the jury that there was nothing before them to establish or warrant the inference that the witness was under any legal obligation to file a return and that whether a return would have been due from anyone would have depended on a number of factors not shown in the evidence. Such instruction of course should have been given if requested. We need not speculate why the defendant chose not to pursue the subject. He cannot now complain of prejudice from a ruling opening a somewhat collateral subject for examination by both counsel where he did not avail himself of his undoubted right and power to extinguish any materially adverse effect.

5. The defendant contends that he was prejudiced by the assistant district attorney's closing argument to the jury in which he referred to certain checks, other than the fifty-four upon which the indictments were based, which allegedly were missing from the records of the city of Revere. This argument ignores testimony in the record concerning other missing checks sufficient to justify such references. The defendant also objects to the assistant district attorney's reference to certain schedules of payments allegedly prepared by the defendant or under his direction. The origin of the schedules was vigorously contested during the

trial.   In both instances, the judge in a timely and appro-
priate manner instructed the jury that the remarks of coun-
sel are not evidence and that the recollection of the jury is
the sole guide for the appraisal of evidence.   There was no
error.

*Judgments affirmed.*

SPIEGEL, J. (dissenting).   I am unable to subscribe to the
court's opinion in its treatment of the assignment of error
relating to the Commonwealth being allowed to cross-exam-
ine the defendant's wife as to whether she, as executrix of
her father's estate, had filed a gift tax return.

The opinion not only seriously undermines traditional
rules of evidence and trial procedure but clears the way for
far ranging interrogation of witnesses about complex tax
matters.   It also sanctions the right of the prosecution to
extract from a witness an admission of a failure to file a
tax return, which a judge or a jury may construe as a viola-
tion of the tax law, when in fact and in law there may have
been no such violation.

## I.

It is axiomatic that any question asked of a witness at a
trial must be relevant to some issue in the case.   The rea-
sons for this rule are well known and do not require elabo-
ration here.   See McCormick, Evidence, §§ 151, 152.   If
irrelevant evidence is admitted the error may be harmless
provided that no unwarranted and prejudicial inferences
are likely to be drawn from this evidence.   But the test
must always be:  (1) was the evidence relevant; (2) if it
was not relevant, was it prejudicial.

In the instant case the question put to Mrs. O'Toole was
irrelevant to any issue in the case and was predicated on a
misconception of the requirements of the Federal gift tax
law.   The specious "logic" of the question seems to be that
if Mrs. O'Toole's father had made gifts to her in 1959
through 1961 then she, as executrix of her father's estate,
would have been obliged to file a gift tax return; her answer
that she had not filed any such return would be evidence

that no such gifts were made and thus the deposits in the defendant's bank account were not gifts from his wife's father.

Before the gift tax question was asked, it had been established that Mrs. O'Toole's father had died in 1964. In these circumstances she was under no obligation to file a gift tax return for the years 1959 to 1961. The donor of a gift has the following obligation to file a gift tax return. "(a) . . . Any individual who in any calendar year makes any transfers by gift (except those which under section 2503 (b) are not to be included in the total amount of gifts for such year) shall make a return with respect to the gift tax imposed by subtitle B." Int. Rev. Code of 1954, § 6019. Treasury Regulation § 25.6019–1 (a) provides: "Any individual . . . who . . . within any calendar year . . . makes a transfer or transfers by gift to any one donee of a value or total value in excess of $3,000 . . . must file a gift tax return on Form 709 for that year." The return for gifts made during a given calendar year must be filed by April 15 of the subsequent year (Int. Rev. Code of 1954, § 6075 [b]), but cannot be filed before the close of the calendar year in which the gifts were made.[1]

Treasury Regulation § 25.6019–1 (b) provides: "If the donor dies before filing his return, the executor of his will or the administrator of his estate shall file the return."

I think that the purpose of Treas. Reg. § 25.6019–1 (b) is to ensure that someone is responsible for making the gift tax returns which the donor would have been obliged to make if he had lived. Those returns would be the one due on gifts made in the year of his death, and possibly the one due on April 15 of the year of his death for gifts in the preceding year.

In the case of a donor who dies owing a Federal gift tax, the following regulation applies to the executor: "If the donor dies before the tax is paid the amount of the tax is a debt due to the United States from the decedent's estate and

---

[1] U. S. Treas. Dept. Int. Rev. Serv. Form 709, p. 3. There is an exception where the return is filed by an executor of a deceased donor.

his executor . . . is responsible for its payment out of the estate. . . . As to the personal liability of the executor . . . see section 3467 of the Revised Statutes (31 U.S.C. 192), which reads as follows: 'Every executor . . . who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debts so due to the United States, or for so much thereof as may remain due and unpaid.' " Treas. Reg. § 25.2502–2.[2] If any gift taxes were due on gifts made by the deceased in years long prior to his death then the executor, as a practical matter, if he knew that no gift tax had been paid by the deceased, would file a return for those prior years, in order to show the computation of the tax.[3] I am aware of cases in which an executor did file a gift tax return where a tax was due.[4] It is difficult to construe such a practical necessity as imposing a duty on an executor to file such a return where no tax is due.

The majority say that, "The judge undoubtedly made his ruling in recognition of the obligation of a legal representative of a deceased person to pay all debts and the consequent possibility or likelihood that, if returns had not been made for the years of the gifts, there would be an obligation of the executrix to make one."

An interpretation of the Federal tax laws most favorable to the Commonwealth would require the establishment of several subsidiary facts in order to make the fatal question

[2] It may be noted that Mrs. O'Toole as donee had no obligation to file an information return, but if any tax on the gift is not paid when due by the donor the tax becomes a lien on the gift and the donee is liable for the tax up to the amount of the gift. Int. Rev. Code of 1954, § 6324 (b).

[3] Treas. Reg. § 25.6151–1: "The tax *shown on the gift tax return* is to be paid by the donor at the time and place fixed for filing the return (determined without regard to any extension of time for filing the return), unless the time for paying the tax is extended in accordance with the provision of section 6161 . . ." (emphasis supplied).

[4] See *Estate of Powers,* 13 T. C. M. 1189, where an executor filed a return in 1949 on gifts made by the decedent in 1941. See also *Estate of Baer,* 16 T. C. M. 949.

relevant.   If it should be ruled that the executrix must file a return for long prior years when a tax is due for those years, then, at the very least, it should be established that a tax was in fact due for those years.

In the instant case the record is devoid of any evidence to show that a gift tax was due.   The statute provides for certain exemptions and exclusions.[5]   In the event that the alleged gifts with which we are here concerned come within the statutory exemptions and exclusions so that no tax would be due, I am unable to discover any sound reason why the executrix should be required to file returns for the years 1959 through 1961.[6]

Even if the executrix were obliged to file returns for years in which no tax were due if the donor had failed to file, there is nothing in the record before us to show that the donor had not in fact filed returns.

Thus, even on this interpretation of Federal tax law most favorable to the Commonwealth, when the defendant objected the judge should have excluded the question unless the Commonwealth offered to introduce other evidence to show that Mrs. O'Toole had an obligation as executrix to file a gift tax return.   See *Donahue* v. *Kenney,* 330 Mass. 9; *Thalin* v. *Friden Calculating Mach. Co. Inc.* 338 Mass. 67, 69; Wigmore, Evidence (3d ed.) §§ 14, 1871 (2).

## II.

The opinion includes the following statement: "In any event, the defendant could have asked the judge to instruct the jury that there was nothing before them to establish or warrant the inference that the witness was under any legal obligation to file a return and that whether a return would have been due from anyone would have depended on a number of factors not shown in the evidence. *Such instruction of course should have been given if requested*" (emphasis

---

[5] Int. Rev. Code of 1954, §§ 2503 (b), 2521.

[6] Compare the duty of the donor to file a gift tax return if the amount of the gift exceeds $3,000, even though no tax is due. Int. Rev. Code of 1954, § 6019.

supplied). This statement, it seems to me, indicates that the majority believe that the question was inadmissible, at least without first providing a basis for the question being asked.

It is also worthy of comment that the opinion refers to the "continued" cross-examination of the witness in which she was asked whether "her father had filed a gift tax return or the witness had done so" and then observes that "[t]he court excluded these inquiries." This is consistent with the position of the defendant[7] but cannot be reconciled with the previous action of the trial judge nor can it be reconciled with the majority opinion. These inconsistencies serve to demonstrate the danger of admitting in evidence even an isolated question on an extraneous matter requiring specialized knowledge. Certainly if the first question asked of her was admissible the question as to whether her father had filed a return was admissible. If it is conceded that the question was not relevant and should have been excluded on the defendant's objection, the only logical basis for affirming the conviction would be a ruling that the question was not prejudicial. While I would not agree, I could at least understand the rationale of the opinion if it ruled that the question was inadmissible but that in considering all of the testimony the majority concluded that the defendant had not shown that the error was prejudicial.

One part of the Commonwealth's case most damaging to the defendant was the evidence of large bank deposits in the years in question. The defendant offered testimony to explain the source of the money. I have no doubt that the answer of Mrs. O'Toole to the question here objected to served the purpose for which it was asked, namely, to imply that no gifts had been made.

It seems obvious from the arguments in the briefs that neither the Commonwealth nor the defendant reached the

---

[7] It is suggested in Wigmore, Evidence (3d ed.) § 15, at p. 309, that a "party who has originally objected to inadmissible evidence [may be] . . . deemed to have *waived the objection* by *subsequently introducing similar evidence* himself."

conclusion of the majority that "[t]he most likely inference, as the matter was left, was that the executrix, if she had received a gift, *might* have been under an obligation." Each brief treated this evidence as showing the commission of a crime, and the Commonwealth's main argument was that the defendant's *wife* could not be prejudiced because she was not a defendant. If both the Commonwealth and the defendant were under the impression that evidence of a crime had been presented, it is unlikely that the jury were more enlightened.

## III.

Perhaps the most alarming implication of the majority opinion is that a defendant who makes a timely objection to a question must, in order to preserve his initial objection, continue to attack the implication of the question by redirect examination and by requesting the judge to instruct the jury not to draw the unwarranted inferences. It seems to me that the majority are saying that even though the question should have been excluded as irrelevant, and even though the defendant may have been prejudiced by the answer to the question, he cannot now be heard to complain "where he did not avail himself of his undoubted right and power to extinguish any materially adverse effect." Heretofore all that has been required to preserve an objection to a question is to make the objection timely and to save an exception to the adverse ruling of the judge. Now, it seems, much more is required. Where a question should not have been admitted without some showing that it would be connected to some relevant issue in the case, the defendant is now required to introduce evidence to show that the question was irrelevant.[8] "If the opponent *duly objected* [emphasis in original] and was erroneously overruled in the first instance, he could not claim to present similar inadmissible facts, because his objection would (in theory) save him, on appeal, from any harm which may accrue, and *he needs no other protection*" (emphasis supplied). Wig-

---

[8] See footnote 7.

more, Evidence (3d ed.) § 15. In addition he is required to request that a specific instruction be made to the jury to neutralize the prejudicial effect of the inadmissible question. Regardless of the salutory effect such measures may have had on the defendant's case, such a rule is tantamount to putting an untenable burden on the defendant. One objection to a question should be enough.

## IV.

It is obvious from the briefs of the defendant and the Commonwealth that both were under the erroneous impression that a failure of Mrs. O'Toole to file a gift tax return as executrix would have been a criminal violation of the Federal tax laws if a gift had been made and no return filed by the donor. Although the prejudicial effect of an inference that the witness violated the tax laws was offset in this case by the fact that the jury would first have to believe that a gift was in fact made, the danger in permitting questions which erroneously suggest criminal violations is heightened by the opinion of the majority. For they hold that the burden rests on the defendant to neutralize these prejudicial inferences. The Commonwealth should not be permitted to range far afield in the complex area of tax law by asking questions which overtly create a definite impression that a witness had violated a tax statute when the question asked had no relevance to any issue in the case. Furthermore, it should not be incumbent upon the defendant to undo the prejudicial effect, as the majority suggest.