COMMONWEALTH *vs.* WILLIAM E. VALCOURT
(and eleven companion cases[1]).

Suffolk. October 5, 1955. — March 9, 1956.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & COUNIHAN, JJ.

*Evidence,* Admissions and confessions, Relevancy and materiality, Competency, Of admitted fact, Of another crime, Of financial condition, In rebuttal. *Practice, Criminal,* Exceptions: whether error harmful. *Pleading, Criminal,* Indictment. *Error,* Whether error harmful. *Homicide. Burning Insured Property.*

There was no error at a murder trial in the admission in evidence of a confession by the defendant, a man stated by a physician to be of low intelligence, suggestible and easily led but capable of testifying and understanding questions "pertaining to his indictment or predicament," after the judge had determined on conflicting evidence upon the voir dire that the confession was voluntary. [709–710]

A question at a criminal trial on cross-examination of a police stenographer during the voir dire pertaining to an alleged confession, as to whether or not the defendant was warned of his rights prior to the interrogation at which the confession was obtained, was relevant to the issue of its voluntariness; but exclusion of the question did not harm the defendant since the police officer who conducted the interrogation subsequently answered the same question before the jury. [710–711]

Fragments of an apartment house destroyed by fire, photographs depicting its burned interior and exterior, and medical testimony stating in detail the cause of death of three of its tenants who died as a result of the fire were admissible at the trial of indictments arising out of the fire, although the jury had taken a view of the scene of the fire and the defendant had admitted that it occurred and that the tenants' deaths were caused by it. [711–712]

At the trial of an indictment charging that the defendant "did assault and beat . . . [a victim] with intent to murder her, and by such assault and beating did kill and murder" her, there was no error in the denial of a motion for a directed verdict of not guilty based on the ground that there was a material variance in that the proof, which showed that the defendant intentionally set fire to an apartment house and that the death of the victim was caused by the fire, did not show any such assault and beating. [712–713]

---

[1] Four of the companion cases are against the same defendant, five are against Edward A. Reynolds, and two are against William E. Valcourt and Edward A. Reynolds.

Conviction upon indictments charging the defendant with being an accessory before the fact to murder in the second degree, to burning a dwelling house, and to burning it with intent to injure its insurers, and with conspiring to burn it and to burn it with that intent, was warranted by evidence that a fire destroyed an apartment house in which the defendant had a beneficial interest and caused the deaths of three tenants therein, that one whom the defendant had known for at least ten years prior to the fire and had employed as handy man and janitor during most of that time confessed at a police station in the defendant's presence to setting the fire and stated that before the fire the defendant had talked to him about doubling the fire insurance on the house and had promised to pay him a sum of money for setting it on fire, that the defendant made no clear denial of such accusation but instead told about relatively unimportant matters, that shortly before the fire the defendant had more than doubled the insurance on the house, and that he owed substantial sums to insurance companies. [716–717]

At the trial of indictments for being an accessory before the fact to burning a building with intent to injure its insurers and for conspiring so to burn it, evidence introduced by the Commonwealth that the defendant, who was not shown to owe any taxes, had not paid any State or Federal income taxes or filed any returns for the two years preceding the fire was irrelevant and its admission was prejudicial error. [717–718]

Evidence of an irrelevant fact did not become competent at the trial of an indictment merely because it was offered in the form of an admission by the defendant. [718]

At the trial of indictments arising out of a fire which destroyed an apartment house and caused the deaths of three tenants therein, evidence introduced by the Commonwealth that shortly before the fire the defendant had served an eviction notice on one of the victims was irrelevant and its admission was prejudicial error. [718]

At the trial of indictments arising out of a fire which destroyed a building in which the defendant had a beneficial interest, evidence that the defendant did not owe money to insurance companies with which he did business should have been admitted to rebut evidence that he did owe it introduced by the Commonwealth to show his financial embarrassment as a motive for the crimes charged. [719]

TWELVE INDICTMENTS, found and returned on June 29, 1953, and July 1, 1953.

The cases were tried in the Superior Court before *Voke,* J.

*William P. Blake, Jr.,* for the defendant Valcourt.

*James D. St. Clair,* for the defendant Reynolds.

*Edward M. Sullivan,* Assistant District Attorney, (*Donald P. Brennan* with him,) for the Commonwealth.

SPALDING, J.   Early in the morning of June 24, 1953, a

fire destroyed an apartment house at 40 Isabella Street, Boston, causing the death of three of the tenants, Camille Quinette, Albertine Gauchet, and Delia O'Connor. Subsequently the defendants William E. Valcourt and Edward A. Reynolds were indicted for various offences arising out of the fire. The defendant Valcourt was charged with (1) murder in the second degree, (2) wilfully and maliciously burning a dwelling house, and (3) wilfully burning a building with intent to injure the insurers. The defendant Reynolds was charged with being an accessory before the fact (1) to murder in the second degree, (2) to wilfully and maliciously burning a dwelling house, and (3) to wilfully burning a building with intent to injure the insurers. Both defendants were charged in two indictments with conspiring wilfully to burn a building with intent to injure the insurers and with conspiring wilfully and maliciously to burn a dwelling house. All of the indictments were tried together and a verdict of guilty was returned on each and sentences were imposed. The felony indictments were tried pursuant to G. L. (Ter. Ed.) c. 278, §§ 33A–33G, and come here on appeals. The conspiracy indictments, which charge misdemeanors, could not, as the statute then read, be tried under §§ 33A–33G. (See now St. 1955, c. 352.) The questions of law arising out of these indictments are before us on bills of exceptions by the defendant Reynolds.

Facts common to all of the cases which could have been found are these. On June 24, 1953, the day of the fire, legal title to 40 Isabella Street was in the defendant Valcourt. A first mortgage on the property in the amount of $12,000 was held by the South Boston Savings Bank, and the defendant Reynolds, with the estate of Fred H. Buckley, held a second mortgage on the property for $11,500. It is admitted that Valcourt held the legal title to the property as a straw for Reynolds and the estate of Buckley. Reynolds was both a real estate operator and a licensed insurance agent. Valcourt had been in Reynolds's employ for about ten years as a handy man and janitor on properties owned or supervised by Reynolds. At the time of the fire Valcourt

lived in an apartment house at 1865 Columbus Avenue which was owned by Reynolds. Prior to the fall of 1952, when he was incapacitated by an accident, Valcourt had been the janitor there.

Early in the afternoon of June 25 (the day after the fire) Valcourt was taken to police headquarters and was interrogated with respect to the fire. The questions and answers were recorded by a stenographer in the police department. During the course of the questioning Valcourt confessed to having set the fire. He further stated that Reynolds had told him that he was about to increase the insurance on the property and would pay him (Valcourt) $100 if he would set the fire. Early in the evening of the same day Valcourt was taken to the scene of the fire where he demonstrated to the police officers how he had set the fire.

In the evening of June 25 Reynolds was taken to police headquarters where he was questioned with respect to the fire. After half an hour, the interrogation was suspended and Reynolds and four police officers went to his office to obtain some records pertaining to his property. After the records were obtained Reynolds was brought back to police headquarters and the questioning was resumed. During this period Reynolds was confronted by Valcourt, who repeated his statements implicating Reynolds. Valcourt's accusation and Reynolds's reaction to it will be discussed in greater detail when we come to discuss the appeals and exceptions of Reynolds.

## VALCOURT'S APPEALS.

Valcourt's second assignment of error presents the question whether the judge erred in ruling, after the voir dire hearing, that Valcourt's confession was admissible. Evidence pertinent to the matter of the confession is as follows. Shortly after he was indicted Valcourt was committed to the State hospital at Bridgewater for an examination, presumably under G. L. (Ter. Ed.) c. 123, § 100A, the so called Briggs law. There was medical testimony from one of the examining physicians to the effect that Valcourt is of low

intelligence, possessing an I. Q. of about 76, and that he is suggestible and easily led. The witness stated nevertheless that in his opinion Valcourt was capable of testifying and that he would understand questions "pertaining to his indictment or predicament."

The Commonwealth's version of the events leading up to the confession is this. Captain Wilson of the homicide squad testified that Valcourt was brought to the police station for questioning at 3:55 P.M. on June 25, 1953; that he began questioning Valcourt at approximately four o'clock; and that this interrogation lasted until 5 P.M., at which time he sent for a police stenographer. The stenographer testified that he began taking down Valcourt's statement at 6:38 P.M., and that it was finished by 7:23 P.M. There was testimony that at the conclusion of the interrogation Valcourt stated that the confession was made without any threats, promises, or inducements of any sort.

The defendant testified on the voir dire that he was questioned for three or four hours before the stenographer was brought in, and that during this period he was told that he would be sent away for life and was threatened with physical violence, but none was applied.

Whether Valcourt's confession was voluntary was for the judge to determine in the first instance on the evidence adduced on the voir dire. The judge was not obliged to believe Valcourt's version of what happened. And on the Commonwealth's version the judge could find that the confession was not obtained by improper means. In short, on conflicting evidence the question was one of fact for the trial judge. The confession having been admitted, the judge, in accordance with the practice in this Commonwealth, permitted the jury under appropriate instructions to pass on the question. *Commonwealth* v. *Preece,* 140 Mass. 276. *Commonwealth* v. *Sherman,* 294 Mass. 379, 394. *Commonwealth* v. *Sheppard,* 313 Mass. 590, 604. There was no error.

In his fourth assignment of error Valcourt contends that the trial judge erred in excluding a question put to the

police stenographer on cross-examination as to whether Valcourt, prior to his interrogation at police headquarters on June 25, was warned of his rights. The law in this Commonwealth is that a confession does not become inadmissible solely because the defendant was not warned. *Commonwealth* v. *Buck,* 285 Mass. 41, 47. *Commonwealth* v. *Mabey,* 299 Mass. 96, 98. But, because a failure to warn does not vitiate a confession otherwise admissible, it does not follow that a defendant should be precluded from inquiring whether a warning was given. Many factors are relevant in determining whether a confession is voluntary and the fact of a warning or its absence is one of them. It has been said that "the fact of . . . warning is nevertheless important evidence to show the confession was voluntary." *Commonwealth* v. *Szczepanek,* 235 Mass. 411, 414. And it would seem to follow that proof of lack of warning is relevant in determining whether the confession was involuntary even though, standing alone, it would not render a confession inadmissible. We are of opinion, therefore, that the question was proper, but that its exclusion in the circumstances here obtaining did not harm the defendant. The excluded question was asked on the voir dire, but during the trial it was asked and answered by Captain Wilson who conducted the interrogation of Valcourt.[1] Thus the jury, who had ultimately to determine whether the confession was voluntary, had this information.

Assignments of error 1 and 5 to 29, inclusive, all allege substantially the same error and will be considered together. At the trial both defendants admitted the fact of the fire and the jury took a view of the scene of it. Nevertheless the Commonwealth was permitted, subject to the exceptions of Valcourt, to put in evidence numerous fragments of the burned building and several photographs depicting the burned interior and exterior of the structure. Neither the accuracy of the photographs nor the authenticity of the portions of the building is challenged. Valcourt contends,

---

[1] Captain Wilson's answer was that no warning was given.

however, that, in view of his admission, this evidence had no legitimate place in the trial and that its only purpose was to inflame the minds of the jury against him.

The photographs of the burned building were plainly admissible to aid the jury in understanding the nature of the fire, even though they had viewed the premises. While it is difficult to see what evidentiary value the portions of the burned building had, we cannot say that their admission in evidence was erroneous. The fact of the fire and the extent of it were not in dispute, and the introduction of some of the charred portions of it gave the jury no information that they did not already possess. Despite the admissions of the defendants with respect to the fire, the Commonwealth was entitled to prove its case. *Commonwealth* v. *Miller,* 3 Cush. 243, 251. *Commonwealth* v. *McCarthy,* 119 Mass. 354, 355.

The thirtieth assignment of error is based on an exception to the admission of medical testimony stating in detail the cause of death of each of the women who died as a result of the fire. As in the case of the assignments just discussed Valcourt argues that since he had conceded that their deaths were caused by the fire this evidence was unnecessary and prejudicial. While, in view of the concession, this evidence was not essential to the Commonwealth's case, we cannot say, for the reasons discussed above, that there was error in admitting it. See *Commonwealth* v. *Robertson,* 162 Mass. 90, 97.

Finally, Valcourt contends that the judge erred in denying his motions for directed verdicts of not guilty on the three murder indictments (assignment 31). In support of these motions he argues that there was a material variance between the allegations of the indictments and the proof in that there was no evidence that the defendant "did assault and beat . . . [the deceased] with intent to murder" her.[1] This contention cannot prevail. The indictments were drawn in accordance with the time honored method of

---

[1] Each of the indictments alleged that Valcourt "did assault and beat . . . [the deceased] with intent to murder her, and by such assault and beating did kill and murder" her.

charging the crime of murder, and they were in conformity with the form prescribed by G. L. (Ter. Ed.) c. 277, § 79. See *Commonwealth* v. *Jordan,* 207 Mass. 259, 266–267; *Commonwealth* v. *Welansky,* 316 Mass. 383, 395. It is inconceivable that the defendant could have been misled. But if the allegations of the indictments were not sufficient to enable him to prepare his defence, he was entitled as a matter of right to such particulars as might be necessary to give him "reasonable knowledge of the nature and grounds of the crime charged." G. L. (Ter. Ed.) c. 277, § 40. *Commonwealth* v. *Galvin,* 323 Mass. 205, 210–211. No request for particulars was made.

## THE APPEALS AND EXCEPTIONS OF REYNOLDS.

At the close of all the evidence and after all the parties had rested the defendant Reynolds moved for a directed verdict as to each indictment. These motions were denied subject to Reynolds's exceptions (assignment of error 60).

The defendant Valcourt testified in his own behalf and repudiated his confession made at the police station. Although the confession was admissible against him, it was not admissible against Reynolds and the judge so ruled. This left the cases against Reynolds without sufficient evidence to warrant convictions unless it was supplied by Valcourt's accusations at the police station in Reynolds's presence and the latter's reply to them.[1] It therefore becomes necessary to set forth this evidence at considerable length. In the evening of June 25 Valcourt in Reynolds's presence was interrogated by Captain Wilson at police headquarters,

---

[1] We lay to one side the statements by the fire inspectors made in Reynolds's presence on the day following the fire, for in our opinion, despite the Commonwealth's argument to the contrary, there was no admission by Reynolds. The evidence was that on June 25 two fire inspectors, accompanied by Reynolds, were looking over the ruins. At one point one of the inspectors asked the other what he thought of the fire and the latter replied that in his opinion "it was a set fire." Reynolds remained silent. But in our opinion his silence cannot be construed as an adoptive admission. The statements of the inspectors were addressed not to Reynolds but to each other. Nor were they of such a nature and made in such circumstances as to call for a reply by Reynolds in order to avoid the consequences of an admission. *Commonwealth* v. *Boris,* 317 Mass. 309, 317–318.

and his answers to the questions were in substance as follows: He saw Reynolds around June 4 on Columbus Avenue at which time Reynolds told him that he was going to double the fire insurance on the property at 40 Isabella Street and would pay Valcourt $100 to set the property on fire. Valcourt next saw Reynolds on June 18 at 1865 Columbus Avenue and he fixed the date of the meeting by a mark he had placed at that time on a calendar. On that occasion Reynolds told Valcourt that he had doubled the fire insurance on the 40 Isabella Street property; that everything was "all set"; and that the "sooner . . . [Valcourt] touched it off the better." Valcourt reminded Reynolds that "some people might be burned to death," but Reynolds's only reply was, "I need the money." Accordingly, Valcourt went to 40 Isabella Street shortly after six o'clock on the morning of June 24 for the purpose of setting the premises on fire. He entered the cellar and proceeded to gather papers and oily rags and piled them against a bin. He then opened a fire door near by and applied a match to the paper and rags. After waiting until "the fire got going good" he "got to hell out." Around noontime on the day of the fire Valcourt met Reynolds on Columbus Avenue and Reynolds told him that if he (Valcourt) was asked anything about the fire he was to say he "didn't know anything about it" or they would both go to jail. Reynolds added that three women had been burned to death and then went away.

Because of their importance we shall set forth the questions put to Reynolds and his replies as they appear in the record. At the conclusion of the foregoing Captain Wilson then turned to Reynolds and said, "Now, Mr. Reynolds, you heard Valcourt confess to setting 40 Isabella Street, in which you have a substantial interest, on fire, and three elderly women died in that fire and he has accused you of hiring him to burn the building down. What have you got to say?" A. "It is true I have a financial interest in 40 Isabella Street and I increased the fire insurance around June 16." Q. "Mr. Reynolds, I am now asking you about

the fire that burned three women to death at 40 Isabella Street. What do you say to that?" A. "Well, the first time I heard that 40 Isabella Street had burned down was about 8 o'clock in the morning. The woman downstairs came up and knocked on my door and woke me up and said the Boston Globe was on the phone and it was important, and wanted me to go downstairs and talk to them. So I was in the nude, so I hollered through the door without opening it that I was just getting up and to have them call me on my phone. So she did, and the Globe called while I was dressing and told me that 40 Isabella Street had burned down and there were three people dead and a lot injured." Q. "What did you do as a result of that?" A. "Called Jim Doyle, my fire adjuster, and told him to go down to 40 Isabella Street, that there had been a bad fire there and I would meet him there as quick as I could get there." Q. "Your first act was to call Jim Doyle, your fire adjuster?" A. "I don't know if it was the first act." Q. "But you did call Doyle nevertheless?" A. "Yes, within five minutes; then I went to see the damage." Q. "Well, the Globe told you, didn't they, that three persons had been burned to death and a lot injured; yet your first thought was to get your fire adjuster on the job, to estimate the damage so that you could collect your insurance?" A. "Well, I am an insurance broker and I had an interest in 40 Isabella Street, and I wanted to protect that interest." Q. "But you called Doyle, your fire adjuster, and left for the scene to take care of your interest?" A. "That's right." Q. "Strange for you to notify the fire adjuster before you rushed down when you heard there were several dead?" A. "No, nothing unusual about that." Q. "Your first thought should have been about the dead people, isn't that right?" A. "That's right." Q. "There were people who paid you to live in your apartment who were burned to death; the fire adjuster could have come at any time, couldn't he?" A. "Well, yes, but generally when there is a case of fire, especially a big fire, my thought is to call the adjuster to get him over there." Q. "Well, you know fire

adjusters can't do anything as far as deaths are concerned?"
A. "No, nobody can restore life."

Reynolds testified that he did not make these answers
and that when asked by Captain Wilson what he had to
say to Valcourt's story he stated emphatically that it was
the "most damnable lie that ever came out of a person's
mouth." He further testified that he demanded a lie de-
tector test for both Valcourt and himself and that his re-
quest was refused. But which was the correct version of
what occurred was one of fact for the jury. On the Com-
monwealth's version Reynolds's answers could be treated
as in the nature of admissions. While there was a conflict
in the evidence as to whether he was under arrest that is of
no importance. "When a defendant while under arrest is
charged with a crime by an accusation made in his presence,
and makes an equivocal reply or one susceptible of being
interpreted as an admission or one not likely to be made by
an innocent man, the question or statement and the answer
or comment are admissible." *Commonwealth* v. *Madeiros*,
255 Mass. 304, 313. *Commonwealth* v. *Graham*, 279 Mass.
466, 468.

Reynolds concedes that under the principle just stated
his answers could be treated as in the nature of admissions.
He strenuously argues, however, that an admission without
more would not warrant a conviction in a criminal case.
But we are not prepared to lay down such a broad rule.
"It well may be that an admission standing alone does not
contain enough to sustain a verdict; but that is because the
facts stated in the admission, or justly to be inferred from
it, are not sufficient to make out a case; and not because
they are put before the jury in the form of an admission."
*Leary* v. *Keith*, 256 Mass. 157, 158. Compare *Credit Service
Corp.* v. *Barker*, 308 Mass. 476, 481.

We are of opinion that the answers that Reynolds made
were such as to warrant submitting the cases to the jury.
Valcourt's story of setting the fire and the part played by
Reynolds was most damaging. Indeed it would be difficult
to conceive of a more serious accusation. Yet at no time,

on the Commonwealth's version, was there anything said by Reynolds which could fairly be classed as a denial. Instead Reynolds told only of such relatively unimportant matters as increasing his fire insurance, his talks with insurance adjusters, and the like. Moreover, the admissions which could be inferred from these answers did not stand alone. It was conceded that Reynolds had a beneficial interest in the property. There was evidence that shortly before the fire he had taken steps to increase the fire insurance on the property from $16,000 to $36,000 and that he owed substantial sums to one or more insurance companies. See *Commonwealth* v. *DiStasio*, 294 Mass. 273, 287. And there was, of course, the evidence that he had known Valcourt for at least ten years prior to the fire and that during most of that time Valcourt had been in his employ. Taking all of this evidence together we are of opinion that the judge did not err in denying Reynolds's motions for directed verdicts.

Assignments of error numbered 14, 17, and 18 will be treated together inasmuch as the questions presented are quite similar. These assignments arise out of the introduction in evidence of Reynolds's answers to a series of questions put to him at the police station. Admittedly most of the answers were admissible. It is argued, however, that some of them were not relevant and were highly prejudicial. Subject to Reynolds's exception the Commonwealth was permitted to show that Reynolds was asked whether he had paid any income taxes State or Federal for the years 1951 and 1952 and that his answers were that he had not. The Commonwealth also brought out the fact that for this period Reynolds had not filed returns. We are of opinion that this evidence was not relevant to any issue before the court and that its admission was prejudicial error. The effect of it was to leave the jury with the impression that Reynolds had committed offences against the tax laws.[1] "Fairness to a defendant in a criminal case requires the rule that the com-

---

[1] See U. S. C. (1952 ed.) Title 26, § 145 (a) and (b).

mission by him of an independent crime cannot ordinarily be shown as evidence tending to show the commission of the crime charged. . . . Moreover, it is not fair that a defendant in the course of a trial should be called upon to defend himself against accusations not set forth in the indictment." *Commonwealth* v. *Stone,* 321 Mass. 471, 473. *Commonwealth* v. *Kosior,* 280 Mass. 418, 423. This evidence did not become competent because it was in the form of an admission. As we said in the case last cited, "An admission out of court by the defendant of an otherwise incompetent fact does not make such fact competent evidence" (page 423).

The Commonwealth seeks to justify the admission of this evidence on the ground that it tended to show Reynolds's weak financial condition and hence a motive for burning his property. But the fact that no income taxes were paid for the years 1951 and 1952 without more had no tendency to establish that Reynolds was impecunious during that period. And as the evidence stood we are unable to see wherein the failure to file returns for those years had any bearing on the issue of Reynolds's impecuniousness. We recognize that in prosecutions for burning a building with the intent to injure the insurers it is competent for the Commonwealth to show that the defendant was in financial straits. *Commonwealth* v. *Haddad,* 250 Mass. 391. But the *Haddad* case is not controlling here, for it was there definitely established that the defendant owed substantial sums for personal property and real estate taxes prior to and at the time of the commission of the crime. Nothing of that sort was shown here.

The Commonwealth was also permitted to show, subject to Reynolds's exception, that Reynolds, shortly before the fire, had served an eviction notice on Delia O'Connor, one of its victims. This was irrelevant and tended to place Reynolds in an unfavorable light before the jury. The Commonwealth seeks to justify this evidence on the ground that it tended to show Reynolds's "state of mind toward one of the deceased" and his "callous attitude toward the

tenants" at 40 Isabella Street. The statement of this contention supplies its own answer.

The Commonwealth was allowed to introduce in evidence, for the purpose of showing Reynolds's financial embarrassment, Reynolds's statement taken at police headquarters in which he admitted that he owed money to insurance companies with which he did business. Reynolds denied having made this statement. The defendant contends that the trial judge committed reversible error in excluding certain evidence offered by him which tended to rebut these statements (assignment of error 39). The evidence sought to be introduced consisted of questions put to one Miller and one Sieger, officials of insurance companies with which Reynolds did business. Each was asked whether Reynolds was indebted to the company which he represented. This evidence was excluded subject to Reynolds's exceptions, and in each instance he offered to prove that the witness would testify that no money was owed. We are of opinion that this evidence was admissible. As stated above the prosecution in a case of this sort had the right to show that Reynolds's financial condition was precarious, as this tended to show a motive for the crime. *Commonwealth* v. *Haddad*, 250 Mass. 391, 396–397. *Commonwealth* v. *DiStasio*, 294 Mass. 273, 287. But when such evidence had been introduced the defendant had the right to rebut it. *Commonwealth* v. *Cooper*, 264 Mass. 368, 376–377.

Other questions relating to the conduct of the trial have been argued but they need not be discussed as they are not likely to arise on a retrial of the cases.

It follows that with respect to Valcourt's appeals the entry must be "Judgments affirmed" and with respect to the appeals and exceptions of Reynolds the entry must be "Judgments reversed"; "Exceptions sustained."

*So ordered.*