COMMONWEALTH *vs.* JOSEPH P. FEMINO.

Suffolk.     March 6, 1967. — May 2, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Evidence,* Admissions and confessions, Relevancy and materiality, Judicial
    discretion, On cross-examination, Of mentality. *Constitutional Law,*
    Admissions and confessions, Assistance of counsel. *Law or Fact.*
    *Practice, Criminal,* Assistance of counsel; Exceptions: whether error
    harmful. *Error,* Whether error harmful.

An alleged confession by one under arrest would not be rendered involun-
    tary solely because he had not been advised of his constitutional rights to
    remain silent and to have counsel.   [513]
Evidence at voir dires in a murder case warranted findings by the trial
    judge that an alleged confession by the defendant to police during an
    interrogation by them after he had been arrested was made voluntarily
    with full knowledge of his constitutional rights to remain silent and to
    have counsel.   [513–514]
The legality of an arrest of the defendant in a criminal case was a ques-
    tion of law for the court.   [514]
At a murder trial where there was evidence of a confession made by the
    defendant to police during an interrogation and the voluntariness thereof
    was in issue no error appeared in the exclusion, on cross-examination by
    the defendant of one of the interrogating police officers, of a question
    whether he had asked the defendant "how far along in school he went."
    [514–515]
There was no merit in a contention by the defendant in this court in a
    murder case that it was error to exclude medical evidence of a mild
    mental deficiency on the part of the defendant which, although of some
    relevance on the issue of the voluntariness of an alleged confession by
    him, was not offered at the voir dire on that issue and was offered at the
    trial only on the issue of the defendant's "competency."   [515]
The defendant in a criminal case was not harmed by the exclusion of cer-
    tain medical evidence of a mild mental deficiency on his part where evi-
    dence thereof was already before the jury through testimony by the
    defendant as to his schooling and inability to read or write and through
    the jury's observation of him on the stand.   [515–516]

INDICTMENT found and returned on November 4, 1965.

The case was tried in the Superior Court before *Bolster, J.*

*Walter T. Healy* for the defendant.

*William A. Doherty,* Assistant District Attorney (*James M. McDonough,* Legal Assistant to the District Attorney, with him), for the Commonwealth.

REARDON, J. The defendant, Joseph P. Femino, was convicted of murder in the second degree on an indictment which charged him and another with the murder of Rayfield Woods. The case is before this court on appeal pursuant to G. L. c. 278, §§ 33A–33G, with a summary of the record, a transcript of the evidence, and assignments of error.

We review pertinent portions of the testimony. At 4 A.M. on September 8, 1965, Rayfield Woods went with one Cheryl Franco to a restaurant on Boylston Street, Boston, to have breakfast. As he left the restaurant a man later identified as Ralph Russo grabbed him by the arm and put him into the front seat of a car driven by the defendant. Cheryl Franco recorded the registration number of the vehicle as it drove off. Miss Franco testified that Rayfield Woods had $650 in his possession while they were in the restaurant. On the same day, at about 6:50 A.M., Boston police officers observed Woods in a semi-conscious condition lying on the side of the roadway at the rear of 400 Rutherford Avenue, Charlestown. He had been shot four times in the head, once in the chest and once in the left thigh. Woods died of these wounds at 12:10 A.M. on September 10.

On September 9, after some investigation into the shooting of Rayfield Woods, the Boston police department requested that the Medford police arrest the defendant, a resident of that city. Shortly after 1:30 P.M. Medford police officers stopped an automobile in which the defendant was riding, placed him under arrest, and took him to the Medford police station where he was fingerprinted and photographed. The defendant was turned over to Boston police officers and taken to Charlestown where he arrived at approximately 2:30 P.M.

At 3:05 P.M. Sergeants Gannon and Nolan of the Boston police, in the presence of a stenographer, commenced ques-

tioning the defendant. During this questioning the defendant was permitted to make a telephone call to a relative by marriage. Sergeant Nolan testified that he left the office several times during the questioning, and on returning after one such occasion about 4:15 or 4:30 P.M. was informed by Sergeant Gannon that the defendant had given a statement implicating Russo and himself in the shooting of Woods.

Sergeant Gannon gave evidence that the defendant admitted that on the evening of September 7 he and Russo had been drinking at various bars when Russo expressed a desire at one point to go to Boston to ''get a colored guy'' who had ''rolled him.'' Early in the morning of September 8 the defendant drove Russo's car to Boston and stopped when Russo told him to pull over. Russo left the car and returned with Woods, placing him in the front seat between the defendant and himself. The defendant then drove to Charlestown and stopped, whereupon Russo pulled Woods from the car, handed the defendant a gun, and ordered him to shoot Woods. The defendant fired four or five shots into the body of Woods, and sometime thereafter the defendant threw the gun from the Mystic River Bridge. He and Russo then proceeded to a restaurant in Somerville where they were seen eating breakfast about 6 A.M.

Following the statement given by the defendant he was booked for assault with intent to murder. At this time Woods was still alive. About 5:15 or 5:30 P.M. the defendant, accompanied by Sergeant Nolan and Detective Ingemi, and several other officers, went to the rear of 400 Rutherford Avenue, Charlestown, where the defendant made some other statements to the officers amplifying certain information which he had previously given to Sergeant Gannon. From Charlestown they proceeded to the Mystic River Bridge where the defendant indicated to the officers the point on the bridge from which he had thrown the gun.

1. Assignment of error No. 1, based on the denial of the defendant's motion to suppress evidence resulting from an illegal arrest, was expressly waived during oral argument before this court on the authority of *Commonwealth* v. *Bow-*

*len,* 351 Mass. 655, which decided the same issue adversely to the defendant.

2. The defendant bases several assignments of error (Nos. 3, 9, 10, 11, 12, 14, 17 and 20) on the alleged involuntariness of his confession. Assignment No. 3 asserts that "[t]he trial judge erred in denying defendant's motion to suppress based on the voluntariness of his confession for the following reasons: First, there was sufficient doubt that the defendant was warned of his right to remain silent, to have counsel present, and of the Commonwealth's right to have any statement introduced into evidence against him; Second, there was evidence that the defendant did not voluntarily, intelligently and knowingly waive his rights; Third, there was evidence that the defendant indicated he wished the services of an attorney; Fourth, there was evidence that the defendant was alone [*sic*] and indicated that he did not wish to be questioned." Assignments 9, 10, 11 and 14 also allege error in the admission of statements made to police officers as voluntary because the defendant was not warned of his constitutional rights. The Commonwealth has correctly indicated that in his assignments the defendant has confused two issues. The questions whether a confession has been obtained in violation of constitutional guaranties and whether it is voluntary are distinct issues, substantively and procedurally. Since the assignments raise the issue in this manner, we will treat the constitutional question only as it bears upon the voluntariness of the confession.

The trial judge held two voir dire examinations on the arrest and interrogation of the defendant. The following evidence is relevant to whether the defendant was advised of his constitutional rights while in the custody of the Boston police department. Sergeant Gannon, who conducted the interrogation of the defendant, testified that after introducing himself, Sergeant Nolan and a police stenographer he informed the defendant of the matter under investigation and warned him, "You do not have to answer any questions I may ask of you. And you are entitled to

have the services of an attorney if you wish it.'' At the end of the interrogation Sergeant Gannon again said to the defendant, ''Now, I warned you of your rights, that you did not have to talk and that you are entitled to the services of an attorney? . . . You have told me this story voluntarily in spite of the fact that I gave you this warning?'' Sergeant Nolan, who was present at the beginning and the end of the interrogation, corroborated Gannon's testimony that the defendant was advised of his right to remain silent and to have the services of an attorney.

Sergeant Nolan further testified that he informed the defendant of his right to use the telephone when he was being booked about 5 P.M. on September 9. As previously stated, the defendant had already telephoned a relative by marriage during his earlier interrogation by Sergeant Gannon.

In contrast, the defendant testified that when he arrived at the police station in Charlestown he was taken into a room where there were three police officers who began questioning him. He testified that the words ''silence'' or ''right to a lawyer'' were never mentioned to him. On cross-examination the defendant continually mentioned that he did not remember being advised of his rights either at the beginning or at the conclusion of his interrogation by Sergeant Gannon or, for that matter, at any other time.

The trial judge found that on at least two occasions the defendant was advised that he might remain silent, that he did not have to answer any questions, and that he was entitled to the services of an attorney. The judge further found that the officers complied with the defendant's request to make a telephone call during his interrogation, and that the statements made to police officers were not in any way coerced, nor made under duress nor as a result of intimidation, but were made voluntarily by the defendant with full knowledge of his constitutional rights.

We discern no error. On the issue of the voluntariness of the confession the trial judge was not required to believe the defendant's testimony that he had not been advised of his constitutional rights. *Commonwealth* v. *Rogers,*

351 Mass. 522, 528–529. In short, on conflicting evidence the question was for the trial judge. *Commonwealth* v. *Valcourt,* 333 Mass. 706, 710. The jury were also given, under appropriate instructions, an opportunity to pass on the facts relative to voluntariness. *Commonwealth* v. *Preece,* 140 Mass. 276. *Commonwealth* v. *Sherman,* 294 Mass. 379, 394. *Commonwealth* v. *Sheppard,* 313 Mass. 590, 604. *Commonwealth* v. *Valcourt,* 333 Mass. 706, 710.[1]

Moreover, the defendant's statements would not be rendered involuntary solely because he was not warned of his rights. *Commonwealth* v. *Buck,* 285 Mass. 41, 47. *Commonwealth* v. *Mabey,* 299 Mass. 96, 98. *Commonwealth* v. *Valcourt,* 333 Mass. 706, 711. This transcript discloses a complete absence of coercion, duress or other oppressive circumstances attending the statements made by the defendant. He was arrested in the presence of a member of his family. He telephoned his wife from the Medford police station before being taken to Charlestown for questioning. During his interrogation Sergeant Gannon placed a telephone call at the defendant's request to a Cambridge police officer, who was related by marriage to the defendant. That the defendant's relative advised him to coöperate with the police in no way affects the admissibility of his later statements. The circumstances relative to the telephone call reflect the absence of the uncontradicted evidence of deceit and prevarication present in *Spano* v. *New York,* 360 U. S. 315. There the defendant was induced to confess after his "friend," a young officer who had not yet completed police academy, pleaded with him on four different occasions that the patrolman would lose his job unless the defendant coöperated.

The defendant testified on cross-examination that he was questioned by Sergeant Gannon for two or two and a half

---

[1] It is to be further noted that the interrogation took place prior to the decision in *Miranda* v. *Arizona,* 384 U. S. 436, which was handed down on June 13, 1966. We need not apply the *Miranda* case retroactively to cases where trial started before that decision. *Commonwealth* v. *Rogers,* 351 Mass. 522, 530–531, and cases cited.

hours. Although this is a longer estimate than that of police witnesses, there is no indication that the defendant's will was overborne by fatigue. Compare *Haley* v. *Ohio,* 332 U. S. 596; *Spano* v. *New York,* 360 U. S. 315. The defendant's contention that police officers promised to allow him to see his son leave for service with the Marines if he coöperated was consistently denied by Sergeant Gannon. The resolution of factual differences was for the judge and jury. However, at several points during trial the defendant testified that police officers did not intimidate, mistreat, or threaten him in any manner. Upon the evidence the judge and jury could find that the defendant, while of somewhat limited intelligence and educational background, was capable of withstanding questioning for this short period of time. Compare *White* v. *Texas,* 310 U. S. 530; *Haley* v. *Ohio,* 332 U. S. 596; *Fikes* v. *Alabama,* 352 U. S. 191; *Spano* v. *New York,* 360 U. S. 315.

3. Assignment No. 12 relates to the refusal of the trial judge to allow the witness, Detective Ingemi, to answer a question concerning the circumstances attending the defendant's arrest. The legality of the defendant's arrest presented no issue of fact for the jury but rather a question of law that the trial judge correctly decided on the motion to suppress. *Commonwealth* v. *McCambridge,* 351 Mass. 516, 520. See *Commonwealth* v. *Rogers,* 351 Mass, 522, 529–530. The question was properly excluded as irrelevant.

4. Assignment of error No. 17 predicates error in the exclusion of the following question asked Sergeant Gannon on cross-examination, "Did you ever ask the defendant how far along in school he went?" The defendant contends that the factor of education bears on the voluntariness of a confession. *Fikes* v. *Alabama,* 352 U. S. 191. See *White* v. *Texas,* 310 U. S. 530. This is undoubtedly true. However, neither an affirmative nor a negative answer to this question would have aided the jury in their determination of voluntariness. An issue presented by the defendant's education or lack of it was for the judge and jury and one not to be initially determined by the interrogating police

officer. The trial judge in excluding this question did not abuse the broad discretion he has in determining the propriety of questions on cross-examination. *Commonwealth* v. *Nunes,* 351 Mass. 401, 406, and cases cited.

5. The defendant alleges in assignment of error No. 20 that the trial judge erred in refusing to permit Dr. Ames Robey, medical director of the Bridgewater State Hospital, "to testify on issues other than in his opinion the defendant was not insane at the time of the alleged offence." The trial judge held a voir dire before eliciting Dr. Robey's testimony. Dr. Robey would have testified that the defendant's I. Q. was 81, thus indicating a mild mental deficiency; that the defendant suffered from a personality defect which caused him to be easily led, and inhibited him from assuming responsibility in work or marital relationships; that tests showed a high resistance to alcohol; and that chest X-rays and a physical examination were within normal limits. We think this evidence may have been of some relevance in determining the voluntariness of the defendant's statements. However, the proper place for the introduction of such testimony was during the voir dire on the voluntariness of the confession. At that time it was not offered. See, e.g., *Commonwealth* v. *Valcourt,* 333 Mass. 706, 709–710. At no time before the trial judge did the defendant seek to sustain admissibility of the evidence on the ground that it was relevant to the issue of voluntariness. The only contention was that the testimony was admissible on the issue of the defendant's "competency." Fairness to the trial judge requires that he be informed as to what issues the evidence may be relevant, especially when it is offered in the face of objection at an improper time during the trial. See *Commonwealth* v. *McCambridge,* 351 Mass. 516, 521. Moreover, the defendant was not harmed by the exclusion of the evidence. Dr. Robey's testimony relative to the defendant's physical examination and high resistance to alcohol reveals no infirmity relevant to the operation of the defendant's mind and will. Evidence of the defendant's mild mental deficiency was already before the jury, primarily in the form of the defendant's own testimony.

He testified that he attended school until the sixth grade, at which time he was sixteen years of age. Although he attended special classes, he testified that he could neither read nor write. The jury thus had the opportunity to observe the defendant on the stand and could form their own opinion as to his mentality. See *Commonwealth* v. *Devereaux*, 257 Mass. 391, 395; *Commonwealth* v. *Clark*, 292 Mass. 409, 415.

6. In accordance with G. L. c. 278, § 33E, we have considered the evidence and are satisfied that justice does not require the entry of a verdict of a lesser degree than that found by the jury or a new trial.

*Judgment affirmed.*