COMMONWEALTH *vs.* RUSSELL W. DANIELS.

Hampden.     September 17, 1974. — January 7, 1975.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, & WILKINS, JJ.

*Evidence,* Admissions and confessions, Of mentality.  *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights.  *Waiver.  Practice, Criminal,* Capital case, New trial, Findings by judge.  *Arrest.*

A voluntary confession to murder by a retardate after waiver of his *Miranda* rights was admissible where there was no evidence of any illegal or improper acts by the police in obtaining it. [606-607]
Where the only evidence of guilt in a murder case was a confession made by the mentally retarded defendant during custodial interrogation, where complete evidence of the severity of his retardation was not introduced at the trial, although such evidence was before the judge at a voir dire on a motion to suppress the confession, and where there was no evidence, either at the voir dire or at the trial, concerning the

effect of the defendant's retardation on his ability to make a voluntary confession, this court ordered a new trial under G. L. c. 278, § 33E. [607-609]

Where a defendant voluntarily went to the police, and was restrained only after he had disclosed sufficient facts to justify his arrest, his subsequent confession to murder was not the product of an illegal arrest. [610]

By informing a defendant arrested for murder that he could telephone "anybody," the police satisfied the requirement of G. L. c. 276, § 33A, that a person in custody be permitted to telephone "his family or friends, or to arrange for release on bail, or to engage the services of an attorney." [610]

A delay in arraigning a criminal defendant until the morning following his confession to murder was not so unreasonable as to require suppression of his confession. [610]

A judge's failure to file findings with respect to a denial of a motion to suppress until almost a year after his ruling on the motion does not render the findings unreliable. [610]

INDICTMENT found and returned in the Superior Court on September 28, 1972.

A pre-trial motion to suppress evidence was heard before *Hayer,* J., and the case was tried before him.

*Howard J. Alperin* (*J. Arthur Hickerson* with him) for the defendant.

*John T. McDonough,* Assistant District Attorney (*William W. Teahan, Jr.,* Assistant District Attorney, with him) for the Commonwealth.

WILKINS, J. The defendant (Daniels), a mentally retarded young man with a second-grade reading ability and an I. Q. of fifty-three, was found guilty of murder in the second degree solely on the basis of his confession to the Springfield police. In this appeal, which is subject to G. L. c. 278, §§ 33A-33G, Daniels argues that, for various reasons, evidence of his alleged confession and admissions should have been suppressed, and that, if they had been suppressed, he would have been entitled to a directed verdict. Although they were not the subject of any exception (or even objection) at trial, Daniels also challenges certain aspects of the judge's charge to the jury, asking this court to consider these challenges within its power under G. L. c. 278, § 33E.

In the middle of the morning of August 22, 1972, the body of the eighty-three year old victim, a butcher knife stuck in her throat, was found in her apartment at 976 State Street in Springfield. There were superficial cuts on her right breast, and stab wounds in her stomach and vagina. There was medical testimony that she had died sometime during the previous day.

Daniels, who was then twenty-six years old, lived alone in an apartment at 986 State Street in Springfield. He did janitorial work in apartment buildings in the neighborhood, including the victim's, and worked at a menial job in a local restaurant. It was stipulated that Daniels had a second-grade reading ability. It appeared at a hearing on Daniels's motion to suppress, but not at the trial, that Daniels had spent between thirteen and fifteen years at the Belchertown State School, a school for the retarded. It further appeared at the voir dire, but not at trial, that Daniels had been diagnosed in October, 1972, at Bridgewater State Hospital as having "a full scale I. Q. of 53, classifying him at the mild to moderate range of mental deficiency."[1] The evidence at the voir dire and before the jury showed that Daniels had left the Belchertown State School at the end of 1970 to live in a "half-way house" in

---

[1] The Bridgewater State Hospital examination, which was conducted presumably pursuant to G. L. c. 123, § 15, as amended through St. 1971, c. 760, § 12, dealt with Daniels's competency to stand trial and with his criminal responsibility at the time of the commission of the alleged offense. The observation report expressed the opinion that, despite his mental deficiency, Daniels was competent to stand trial and was "mentally and criminally responsible" on August 21, 1972.

Although that report did not address the question whether Daniels had the mental capacity to make a knowing and intelligent waiver of his rights and to make a voluntary and intelligent confession to a crime, some opinions were given concerning Daniels's level of judgment. No other medical opinions were offered at the voir dire, and, as indicated in the text of the opinion, the conclusions stated in the Bridgewater report were not before the jury.

Seven days after Daniels was admitted to Bridgewater, he was described as "functioning on a low average level of intelligence," "[j]udgment and insight were very poor" and "[m]emory was impaired." A week later Daniels was described (in part) as "showing limited insight and judgment into his problems, but with coaching he appeared to understand what the charges against him are." An extension of the statutory twenty-day observation period was requested for further testing and was granted. During the extended observation period, opinions of competency to stand trial and "mentally and criminally responsible at the time of the commission of the offense" were arrived at, as well as the diagnosis: "Mental Deficiency, I. Q. 53, Mild to Moderate."

Springfield. In May, 1971, he moved to his own apartment where he took care of himself.

Late in the morning of the day the victim's body was found, a Springfield police officer spoke to Daniels in the vicinity of 976 and 986 State Street. He told Daniels that there had been an incident and asked him if he would go to the police station to talk with the investigating officers. Daniels agreed and went of his own volition.

The account of what transpired at the police station, summarized next in this opinion, is based on the findings made by the judge following the voir dire and on the evidence which was introduced at trial. As to events at the police station, there was no significant difference between the evidence introduced at the voir dire and the evidence introduced at the trial.[2]

Daniels was turned over to the officer in charge of the investigation at approximately noontime. He was taken to an interrogation room, approximately ten feet square. Four officers questioned him from time to time, but not all were present at all times. Initially he was given "his *Miranda* warnings."[3] See *Miranda* v. *Arizona,* 384 U. S. 436, 478 (1966). Daniels said he knew he had rights, because he had heard about them and seen them on television. He also was told that he could use a telephone to call anyone. The officers testified that Daniels said he understood the explanations of his rights which were given to him.

Although, initially, he denied that he had ever been in the victim's apartment, by 3 P.M. he had made an oral confession to stabbing the victim with a knife. About 3 P.M. an officer who previously had not been present came in. He

---

[2] Daniels gave a different description of what occurred, which was not accepted by the judge at the voir dire nor, apparently, by the jury. He testified that he signed a statement, but he did not know or understand what he was signing. He said he signed because the police told him that if he talked, they would let him go, but if he did not talk, they would lock him up. At trial he denied stabbing the victim.

[3] He was told, in the usual form, that he had a right to remain silent; that if he did speak, anything he might say would be used against him; that he had a right to talk to a lawyer and have him present while he was being questioned; and that if he could not afford to hire a lawyer, one would be hired for him.

also gave Daniels *Miranda* warnings, and, being uncertain whether Daniels understood, he explained them again in detail. A written statement was then prepared, which Daniels tried to read but could not. It was read to him, and he signed it. Daniels then went with five policemen to the victim's apartment, where, according to testimony from policemen, he described how he committed the crime.[4] Daniels was booked at the police station shortly before 7 P.M., on his return from the apartment, and was arraigned the next morning.

Almost a year after the denial of Daniels's motion to suppress, the judge filed a memorandum and order which contained strong findings that Daniels "did knowingly, willingly, voluntarily, and intelligently waive his constitutional rights under the Miranda warnings," in an act "which was a product of a rational intellect." The judge further found that "the prosecution has carried its heavy burden that the defendant knowingly, willingly, voluntarily, and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel during the period he was in custody." He found that no force was used and no promises were made by the police to obtain the oral and written statements. He further found that there was no "physical or psychological pressure by the police at any time," and that Daniels's statements to the police were a meaningful act of volition. He made no reference in his findings to Daniels's I. Q. We turn first to a consideration of the legal principles governing the admission in evidence of confessions made in the course of police interrogation of persons like Daniels.

A minor may waive constitutional rights and make a confession which is admissible against him. See *West* v. *United States,* 399 F. 2d 467, 468-469 (5th Cir. 1968), cert. den. 393 U. S. 1102 (1969); *Cotton* v. *United States,* 446

---

[4] The fact that there was evidence from the police that during this trip Daniels corroborated portions of his confession has no bearing on the admissibility of that confession. True, as well as false, confessions are inadmissible if obtained in violation of a defendant's rights. *Rogers* v. *Richmond,* 365 U. S. 534, 543-544 (1961). *Jackson* v. *Denno,* 378 U. S. 368, 384-386 (1964).

F. 2d 107, 110 (8th Cir. 1971). See, for decisions not governed by the *Miranda* case, *Commonwealth* v. *Bond,* 170 Mass. 41 (1897); *Commonwealth* v. *Makarewicz,* 333 Mass. 575 (1956); *People* v. *Lara,* 67 Cal. 2d 365, 378-386 (1967), cert. den. 392 U. S. 945 (1968); *People* v. *Hester,* 39 Ill. 2d 489 (1968), cert. dism. as improvidently granted, 397 U. S. 660 (1970); *United States ex rel. Richardson* v. *Vitek,* 395 F. 2d 478 (7th Cir. 1968). Similarly, an adult with a diminished or subnormal mental capacity may make an effective waiver of his rights and render a voluntary, knowing and admissible confession. See *Commonwealth* v. *Clark,* 292 Mass. 409, 411-412 (1935); *Commonwealth* v. *Valcourt,* 333 Mass. 706, 709-710 (1956); *Commonwealth* v. *Harrison,* 342 Mass. 279, 284-285 (1961); *Commonwealth* v. *Femino,* 352 Mass. 508, 515-516 (1967); *United States* v. *White,* 451 F. 2d 696, 700 (5th Cir. 1971), cert. den. 405 U. S. 998 (1972) (post-*Miranda*). But see *United States* v. *Hull,* 441 F. 2d 308 (7th Cir. 1971) (thirty-four year old mental defective). However, circumstances and techniques of custodial interrogation which pass constitutional muster when applied to a normal adult may not be constitutionally tolerable as applied to one who is immature or mentally deficient. See *Commonwealth* v. *Cain,* 361 Mass. 224, 227-229 (1972) (fifteen-year old boy); *Gallegos* v. *Colorado,* 370 U. S. 49, 54-55 (1962) (fourteen-year old boy); *United States* v. *Blocker,* 354 F. Supp. 1195, 1200-1202 (D. D. C. 1973) (limited mental ability). In such cases, "special care in scrutinizing the record must be used." *Haley* v. *Ohio,* 332 U. S. 596, 599 (1948). Whether the facts support the admission of a confession in any given case must be determined by an examination of "the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation." *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 226 (1973).

We have carefully reviewed the evidence, both before the judge at the voir dire and before the jury and we conclude that there was evidence which warranted the findings made by the judge and which would have warranted a conclusion by the jury that the confession could be considered by

them. A finding that the police used physical force, intimidation or threats would not have been justified. Certainly a finding that the questioning was improper, leading or suggestive of desired answers would not have been appropriate on the evidence. Daniels was not denied access to food or drink. He declined to speak on the telephone to a friend who had helped him occasionally and who called during the police questioning. The interrogation lasted not over three hours before Daniels confessed. Cf. *Fikes* v. *Alabama,* 352 U. S. 191, 196-197 (1957), reh. den. 352 U. S. 1019 (1957); *Sims* v. *Georgia,* 389 U. S. 404, 407 (1967).[5]

The fact that Daniels was mildly to moderately mentally retarded, with an I. Q. of fifty-three, does not compel a determination as matter of law on this record that Daniels did not knowingly and willingly waive his *Miranda* rights and make a voluntary confession, admissible pursuant to constitutional standards. Daniels although mentally retarded, had had twenty-six years of living experience and had been discharged into the community from a State school for the mentally retarded by way of a "half-way house." He testified before the judge on the voir dire and before the jury at trial. In these circumstances and on this record, we cannot rule that an error of law was committed when Daniels's confession was not suppressed and was subsequently introduced at his trial. See *Commonwealth* v. *Mabey,* 299 Mass. 96, 98-99 (1937); *Commonwealth* v. *Murphy*, 362 Mass. 542, 547 (1972).

Although we have reached this conclusion, we believe, nevertheless, in the exercise of our power under G. L. c. 278, § 33E, that justice requires a new trial. See *Commonwealth* v. *Rutledge,* 356 Mass. 499, 502-503 (1969). See also *Commonwealth* v. *Mazza, ante,* 30, 33 (1974), for a

---

[5] Although it appears that the police were aware of Daniels's mental retardation, the admissibility of his confession does not depend on whether the police had such knowledge. His capacity to make a knowing and intelligent waiver of his rights is unrelated to the existence or absence of police knowledge of his mental capacity. See *Commonwealth* v. *Femino,* 352 Mass. 508, 514 (1967). Such police knowledge is relevant in assessing the conduct of the police on due process of law grounds. We reject, however, the defendant's argument that the confession, if voluntarily given after a knowing and willing waiver of *Miranda* rights, was obtained in violation of due process requirements.

listing of numerous cases in which this court has used its power under § 33E. We have arrived at our view that there should be a new trial because no evidence was presented at the voir dire or at the trial to aid the trier of fact in evaluating the impact of custodial interrogation on Daniels in these circumstances. He might be more suggestible and subject to intimidation than a person of normal intelligence. He might not be able to understand the consequences of his right to a lawyer or his right to remain silent. He might be inclined to state that he understands even when he does not. Many of Daniels's statements that he understood his rights were simple "yes's" or "yeah's," and not reassuring explanations of his asserted comprehension. See *Commonwealth* v. *Cain,* 361 Mass. 224, 228 (1972). Furthermore, the police officers testified that Daniels had difficulty understanding their explanations of his rights. On this record, in which the only evidence that Daniels committed the crime came from his confession and his admissions, a substantial injustice may have been done to him because of the absence of expert testimony on the crucial issues of voluntariness and waiver. We do not know enough about intelligence quotients (I. Q.) and mental retardation to rule conclusively on this question. Yet we do know enough to believe the matter needs further analysis.[6]

---

[6] Where sufficient medical or other testimony concerning the mental capacity of a defendant (whose confession has been offered) has not been introduced below and medical or other expert testimony seemingly would be of assistance to the lower court in passing on a motion to suppress, Federal appellate courts have sent cases back for further hearings. See *United States* v. *Silva,* 418 F. 2d 328, 331 (2d Cir. 1969); *Frazier* v. *United States,* 419 F. 2d 1161, 1169 (D. C. Cir. 1969), which remanded a case for a further hearing, and *United States* v. *Frazier,* 476 F. 2d 891 (D. C. Cir. 1973), upholding the admissibility of a confession following that further hearing at which expert medical testimony was introduced; *United States* v. *Watson,* 469 F. 2d 362, 367 (5th Cir. 1972).

Where medical or other evidence relating to the mental capacity of an allegedly mentally deficient defendant has been introduced, Federal decisions indicate that any ruling on the voluntariness of the defendant's action should be made with particular attention to that medical evidence. See *Blackburn* v. *Alabama,* 361 U. S. 199, 208-209 (1960); *Pea* v. *United States,* 397 F. 2d 627, 631-635 (D. C. Cir. 1967); *Cooper* v. *Griffin,* 455 F. 2d 1142, 1144-1145 (5th Cir. 1972); *United States ex rel. Lynch* v. *Fay,* 184 F. Supp. 277, 280-281 (S. D. N. Y. 1960), app. dism. 284 F. 2d 301 (2d Cir. 1960). See also *People* v. *Lara,* 67 Cal. 2d 365, 377-378 (1967); *Commonwealth* v. *Masskow,* 362 Mass. 662, 667-668 (1972), discussing *Eisen* v. *Picard,* 452 F. 2d 860 (1st Cir. 1971), cert. den. 406 U. S. 950 (1972).

There is another reason for granting a new trial. The evidence before the jury showed that Daniels had a second-grade reading ability and that at some time he had been at the Belchertown State School. However, for some unexplained reason, significant available evidence bearing on Daniels's mental capacity was not introduced before the jury, although it had been introduced at the voir dire. The jury were not told that Daniels had been at the Belchertown State School for at least half his life, that he had an I. Q. of fifty-three and that he was regarded medically as mildly to moderately retarded. Cf. *Commonwealth* v. *Femino,* 352 Mass. 508, 515-516 (1967). If even this evidence (although not interpreted by an expert witness) had been before the jury, the verdict might have been different. The jury deliberations were protracted and at one point characterized as deadlocked. The only serious question must have been Daniels's capacity to waive his constitutional rights and to give a voluntary confession.[7]

In sum, we believe that there should have been a greater exposition of Daniels's capacity to arrive at knowing and voluntary judgments on matters of great importance to him, particularly in the context of the police questioning which he underwent. Such an inquiry can occur at a further hearing on the motion to suppress and, if appropriate following that voir dire, at a new trial. We would expect that medical and perhaps other expert testimony would be offered at any further hearings. If he remains indigent, Daniels should, of course, be provided with sufficient funds to obtain expert assistance in any such inquiry. In view of our decision, we need consider only those other issues argued by Daniels which may arise during the further proceedings in the Superior Court.

---

[7] The case went to the jury at 1:35 P.M. on February 23, 1973. At 10:26 P.M. the jury sent the judge a note that they were deadlocked. With the assent of counsel for Daniels, the judge read to the jury portions of *Commonwealth* v. *Tuey,* 8 Cush. 1, 2-3 (1851). (See now *Commonwealth* v. *Rodriquez,* 364 Mass. 87 [1973].) The jury returned to their deliberations at 11 P.M. At 12:25 A.M. on February 24, 1973, the jury were sent to bed for the night. Later that morning, shortly after 10 A.M., the jury resumed deliberations. At 11:55 A.M., the jury returned a verdict of guilty of murder in the second degree.

Daniels argues that he was placed under arrest before there was probable cause to arrest him (*Commonwealth* v. *Avery,* 365 Mass. 59, 65 [1974]), and that, therefore, any confession, even one given after a voluntary and knowing waiver of rights, must be suppressed as the product of an illegal arrest. We need not decide this question because the evidence does not support a finding of an illegal arrest. Daniels went to the police station voluntarily, and was not restrained until after he had disclosed sufficient facts to justify his arrest.

The confession was not rendered inadmissible by the police failure to comply with the requirements of G. L. c. 276, § 33A. That statute provides that a person held in custody at a police station (or at some other place of detention having a telephone) must be permitted to use the telephone "to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney." There was evidence that Daniels was given timely notice that he could call "anybody." Although it would have been preferable if the police had recited the purposes for which such a call could be made, there was sufficient compliance with the purpose of the statute so that evidence of Daniels's confession need not be suppressed. Cf. *Commonwealth* v. *Jones,* 362 Mass. 497 (1972).

The delay in arraigning Daniels until the morning following his confession was not unreasonable and does not require the suppression of his confession. See *Commonwealth* v. *Dubois,* 353 Mass. 223, 226-227 (1967).

The judge's failure to file findings with respect to the denial of the motion to suppress, until almost twelve months after his ruling on that motion, does not render the findings unreliable. Where necessary, we have remanded criminal cases for findings in support or explanation of interlocutory rulings. There is no indication that the judge applied incorrect legal standards in denying the motion to suppress or that he based his conclusion that the confession was voluntary in any respect on a belief that the confession was true. Nor do we see any suggestion that the judge reached his conclusions concerning Daniels's waiver of his

constitutional rights because Daniels was found competent to stand trial. The standards for these determinations are different, of course, and were not confused by the judge.

For the reasons stated earlier in this opinion, however, the judgment is reversed and the verdict is set aside for further proceedings in the Superior Court.

*So ordered.*