## Commonwealth *vs.* Kevin Hensley.

Suffolk. February 6, 2009. - September 15, 2009.

Present: Marshall, C.J., Ireland, Cordy, Botsford, & Gants, JJ.

*Practice, Criminal,* Motion to suppress, New trial, Admissions and confessions, Assistance of counsel, Request for fees and costs, Capital case, Fair trial. *Constitutional Law,* Fair trial, Confrontation of witnesses, Admissions and confessions, Assistance of counsel, Waiver of constitutional rights. *Waiver. Evidence,* Expert opinion. *Homicide. Mental Impairment.*

There was no merit to the criminal defendant's claim that he did not receive a hearing before a fair and impartial tribunal on his motion to suppress statements he had made to police. [728-731]

At a murder trial, no error arose from the admission in evidence of the testimony of a medical examiner who neither performed nor attended the victim's autopsy, regarding his opinion as to the cause of death, where the witness opined as an expert on the basis of information on which experts ordinarily and properly may rely, and was subject to cross-examination; further, to the extent that the witness's testimony on direct examination regarding specific findings in the autopsy report should not have been admitted at that point in the trial, the error was harmless; finally, to the extent that the witness's testimony was contested at trial, the testimony did not bear on the sole issue before the jury on the theory of premeditation. [731-734]

There was no merit to the criminal defendant's claim that his counsel was ineffective at the hearing on a motion to suppress statements the defendant had given to police, where counsel's decision not to present expert testimony regarding the defendant's mental state was plainly strategic and not manifestly unreasonable, where the defendant never admitted entering the place where the victim was found or even seeing the victim, and where the police were meticulous in ensuring that the defendant had the ability and capacity knowingly, voluntarily, and intelligently to waive his Miranda rights [734-738]; further, counsel was not ineffective at trial, where the decisions not to call a certain expert witness and not to introduce the defendant's medical records were strategic and not manifestly unreasonable, in light of the fact that testimony from the defendant's family and friends raised the issue of the defendant's mental state without exposing the jury to potentially damaging evidence [738-742].

The judge at a criminal trial did not abuse his discretion in allowing the defendant's motion for funds to retain an expert witness, but for less than the defendant requested. [743]

Indictment found and returned in the Superior Court Department on March 25, 2002.

A pretrial motion to suppress evidence was heard by *Charles J. Hely,* J.; the case was tried before *Charles T. Spurlock,* J., and a motion for a new trial, filed on August 28, 2006, was heard by him.

*Stewart T. Graham, Jr.,* for the defendant.

*Kathleen Celio,* Assistant District Attorney, for the Commonwealth.

CORDY, J. On the afternoon of January 31, 2002, Nancy Hensley was found dead in the basement of her home in the East Boston section of Boston. She had been strangled to death with a necktie. Her husband, Kevin Hensley, was indicted for the murder, and, after a five-day jury trial, was found guilty of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel, Hensley filed a motion for a new trial, alleging ineffective assistance of counsel. The motion was denied. The appeal from the denial was consolidated with his direct appeal.

Hensley argues that he was denied the right to a fair and impartial tribunal with respect to his motion to suppress; that it was error to admit in evidence the testimony of a medical examiner who neither performed nor attended the victim's autopsy; and that the evidence at trial was insufficient to support his conviction under the theory of extreme atrocity or cruelty. He also contends that his trial counsel was ineffective in failing to present expert testimony and medical records at the suppression hearing and at trial, and in failing to raise the issue of police deception when Hensley was interrogated shortly after his suicide attempt. Finally, Hensley claims that the denial of full funding for an expert witness to assist in his motion for a new trial was erroneous. We affirm the conviction, affirm the order denying his motion for a new trial, and decline to grant relief under G. L. c. 278, 33E.

1. *Trial.* The jury could have found the following facts. Kevin and the victim were married in 1979, and had four children. By January, 2002, the Hensleys were experiencing marital problems. They argued about whether the victim was spending enough time at home and whether she was spending too much time at a local gym, possibly in the company of another man. Convinced that the victim was spending time with other men, Hensley on one occasion disguised himself in a fake beard and watched the

victim as she was working out at the gym. Hensley saw the victim talking to some other men but did not see any sign of infidelity. Hensley confronted her about the incident.

Thereafter, on January 9, 2002, the victim obtained a temporary abuse prevention order against Hensley and filed a complaint for divorce. The abuse prevention order required Hensley to leave immediately and stay away from the family's home at 198 Byron Street. The order also gave the victim custody of the couple's four children and prohibited Hensley from contacting the children pending a further hearing. The temporary restraining order expired at 4 P.M. on January 16, 2002, and a hearing was set for that date.

On the day of the hearing, Hensley and the victim entered into an agreement that was entered as a temporary order in the divorce proceeding. Hensley agreed that except for visitation exchanges he would remain away from the marital home. Hensley and the victim agreed that she would have the use of the family's 2000 Buick LeSabre automobile until the next court hearing. They also agreed that Hensley could enter the marital home that day, January 16, to retrieve his personal belongings, in the presence of a police officer. Finally, they agreed that their children would remain in the victim's care until the next court hearing, but that Hensley could have reasonable visitation if arranged twenty-four hours in advance.

After Hensley was served with the initial abuse prevention order, he began living at the Winthrop home of his sister. During the weeks that followed, Hensley's family members, friends, and his supervisor at work noticed that he appeared to be depressed and distraught about the breakup of his marriage, especially the loss of custody of his children. He became despondent, and separately confided to two close friends that if he lost custody of his children he would kill the victim and kill himself.

On January 22, 2002, the victim filed a complaint for contempt in the Probate and Family Court alleging that Hensley was not upholding their January 16 agreement.[1] Four days later, at approximately 9:30 P.M., one of Hensley's neighbors saw Hensley jumping over a fence that surrounded an empty lot opposite 198

---

[1]The complaint was not introduced as an exhibit and the jury heard no evidence of the specific allegations in the victim's contempt complaint.

Byron Street. Hensley walked by the neighbor, said, "Hi," put his head down, and continued walking down the street. The neighbor contacted the victim and informed her about it. On the night before the victim's death, Hensley told one of his friends that he had been "trying to see his kids," and that "[h]e was over by the house and [the victim] saw him and she was going down to take another restraining order out on him."

On January 31, Hensley reported to work with the Boston transportation department's "tow and hold" unit at 6:30 A.M. At approximately 8 A.M., after having towed one vehicle, Hensley told his supervisor that he was not "feeling right" and asked if he could use some vacation time and go home. Hensley drove to his sister's home, where he stayed for a brief period of time, and then continued on to 198 Byron Street.

When he arrived at Byron Street, Hensley parked his automobile around the corner, out of view from the house. Hensley was next seen leaving the house at about 11:45 A.M. He left in the family's Buick LeSabre automobile.

Later that afternoon, Hensley's eldest daughter arrived home from school. As she entered the kitchen, she noticed that a blanket that was kept in front of the back door to keep the draft out had been moved away. Everything that had been in front of that door was moved away "like someone had used it." The dead bolt, which was usually locked, was unlocked. She also noticed that the comforter was not on the bed in her mother's room. After doing some homework, she went to the basement to get something to drink. Noticing the door to the bathroom in the basement was closed, she opened the door and discovered her mother lying on the floor under the comforter from the bedroom. She telephoned 911.

Sergeant Detective Daniel J. Coleman of the Boston police department's homicide unit supervised the investigation of the victim's death.[2] Much of the evidence from that investigation was presented at trial. When the victim's body was found, her head was covered by a white sweatshirt and a pink garment, and there appeared to be blood on her hands. A blue necktie was tied tightly around her neck. She had blood on her face and her

---

[2]At the time of trial, Sergeant Detective Coleman's position was deputy superintendent commander of the Boston police department's homicide unit.

left eye was swollen. She was wearing one sock, and a matching sock was found on the kitchen floor with what appeared to be a bloodstain. There was no sign of forced entry into the home.

As the investigation into the death was proceeding, Hensley drove the Buick LeSabre automobile to New Hampshire, parked in a lot at the Waterville Valley ski area, and tried to asphyxiate himself by running a dryer vent hose into the vehicle from the exhaust pipe. His attempt proved unsuccessful, however, when at approximately 9 P.M., New Hampshire police officers and emergency personnel pulled him out of the vehicle and brought him to Speare Memorial Hospital (hospital) in Plymouth, New Hampshire.

At approximately 11:30 P.M., Sergeant Bret J. Beausoleil of the New Hampshire State police was informed that Hensley was the subject of an attempted suicide and a suspect in a homicide in Boston, and that the authorities in Massachusetts wanted the New Hampshire State police to interview Hensley if possible. Sergeant Beausoleil drove to the hospital, where he met with New Hampshire State Trooper Scot Bryan, Grafton County Attorney Kenneth Anderson, and emergency room physician Dr. John Eppolito. A decision was made to hold Hensley on an "involuntary emergency hospitalization" (IEH) due to his suicide attempt.

At 1:11 A.M. on February 1, 2002, after a telephone conversation with Sergeant Detective Coleman, Sergeant Beausoleil and Trooper Bryan met with Hensley in a hospital waiting room. Sergeant Beausoleil read Hensley the Miranda warnings while he followed along on a printed waiver form. Hensley initialed and signed the waiver form, indicating that he understood his rights and was willing to answer questions. When asked whether he was under the influence of alcohol, illegal drugs, or medication, Hensley said that he had been on Klonopin and Celexa for the previous couple of months, but he had stopped taking those medications about one month earlier. Hensley also explained that he had been seeing a doctor in East Boston for depression. Hensley explained that he had not used any alcohol or illegal drugs, but that he had taken a bottle of sleeping pills.

Sergeant Beausoleil then questioned Hensley about his activities on January 31, 2002, up to the point at which he was found

at Waterville Valley. Hensley explained that he went to work around 6:30 A.M. and left around 8:30 A.M. After leaving work he drove to his sister's house in Winthrop and then continued on to 198 Byron Street. Hensley explained that he went there to get the Buick LeSabre automobile and kill himself. When asked whether he went into the house, Hensley first answered, "I think I did." Later in the interview, Hensley's answer changed to "I don't remember, it's all a blur, I just want to die." When asked if he remembered seeing the victim that day, Hensley replied, "I can't remember, it's all a blur." Hensley acknowledged having keys to both the house and the automobile. At one point during the interview, Hensley lay down on the couch in the waiting room and said that he felt dizzy and tired.

At 2:09 A.M., Sergeant Beausoleil stopped the interview and contacted Sergeant Detective Coleman. Sergeant Beausoleil then informed Hensley that his daughter had found the victim dead. Hensley said, "My wife. What are my kids going to do? I can't live no more. What are they going to do without a mother and father?" Shortly thereafter, Hensley asked for aspirin and as a nurse gave it to him, Hensley moved from a laying position on the couch to a kneeling position on the floor in front of the couch. Sergeant Beausoleil noticed that Hensley's hand was shaking as he took the aspirin. When Hensley was asked whether he had ever threatened to harm his wife to any of his friends, Hensley said, "I couldn't have said that, I don't believe I said that." The interview ended at about 2:51 A.M. About thirty minutes later, Sergeant Beausoleil learned from Sergeant Detective Coleman that a warrant was in effect for Hensley's arrest. As a result, Hensley was transported to the Grafton County jail, and Sergeant Beausoleil took possession of the clothing Hensley was wearing on admission to the hospital.

Dr. William Zane from the Massachusetts medical examiner's office performed an autopsy on the victim's body on February 1, 2002. Dr. Zane was scheduled to testify at Hensley's trial, but he was unavailable on the date of his expected testimony. In his place, the Commonwealth called Dr. Mark Flomenbaum, the chief medical examiner of the office of the chief medical examiner at the time of trial. As further described below, he testified regarding the cause and manner of the victim's death

(ligature strangulation) based largely on the findings and results of the autopsy.

Hensley's defense was one of mental impairment, focused primarily on persuading the jury that he was incapable of forming the mental states required for murder in the first degree under the theories of deliberate premeditation or extreme atrocity or cruelty. Although Hensley did not testify at trial, trial counsel elicited substantial evidence in support of that defense.

Hensley's sister, Denise Hagemeister, testified about Hensley's character and his demeanor both before and after the initial abuse prevention order. She testified that Hensley was a "wonderful man, he's a wonderful father, brother and son to my parents. Very, very close to his children. His children were his life, basically." When Hensley was served with the initial abuse prevention order, he went to Hagemeister's house and was "basically hysterical, crying and . . . upset." Between that time and the victim's death, Hagemeister saw Hensley for several hours daily, during which time he cried, was "depressed," "[h]ysterical," and "despondent." Hagemeister described her brother as "a different person," explaining that "[i]t was like night and day." Hensley stopped showering, he was not eating or sleeping, and he lost weight. Hagemeister testified that Hensley "basically fell apart." Hagemeister also testified that she was concerned about Hensley's health because he was "very unstable," "depressed," and "didn't want to live any more." Finally, Hagemeister stated that Hensley "cried constantly" and was "[c]onstantly wringing his hands and pacing and [was] incoherent. He would . . . just talk incoherently and didn't make any sense . . . ."

Through cross-examination of the Commonwealth's witnesses, including Hensley's family, friends, and work supervisor, trial counsel elicited further testimony about Hensley's mental health issues, highlighting the change in Hensley's demeanor and behavior after the initial abuse prevention order. For example, Hensley's daughter described her father as having a "nervous breakdown" the first time she saw him after he moved out of the house. She testified that he "kept crying" and she did not think he was eating because he had lost weight. She also testified that her father could not talk much because he was crying a lot and shaking; that he had stopped taking prescription Celexa

for depression; and that he appeared not to want to live any more. Hensley's work supervisor testified that Hensley told him that he did not see any point in living if he was going to lose his wife and children. Hensley's friends testified that Hensley was "[v]ery distraught," and "crying 24/7" since he moved out of 198 Byron Street; was "depressed and lethargic"; was depressed most of the time; and could not function and "looked like a zombie."

During his closing argument, trial counsel described the stark difference between Hensley's mental and physical condition before and after the abuse prevention order, as "the focal point of the case": a case "about the downfall of a man who feared that he was losing his kids." He reminded the jury that Hensley suffered from depression even before the abuse prevention order and argued that it had gotten worse; that Hensley was suicidal; and that the jury had heard "compelling evidence of mental impairment," affecting his "state of mind, the intent." Counsel urged the jury to conclude that Hensley was not capable of deliberate premeditation; that he only planned to kill himself on January 31, 2002, but "snapped" when he encountered his wife at 198 Byron Street; and that he should be found guilty only of murder in the second degree.

Counsel argued further that the Commonwealth failed to prove that the murder was extremely atrocious or cruel because that theory of murder relied on Dr. Flomenbaum's testimony regarding the length of time it took the victim to die and the nature of the struggle that led to her death. He characterized that testimony as "wholly lacking, wholly insufficient, and not worthy of crediting," and reminded the jury that Dr. Flomenbaum did not perform the autopsy or write the report, did not go the scene or view the interior of the house in another way, and that his sole preparation to testify occurred the morning of his testimony.

2. *Discussion.* a. *Motion to suppress.* Before trial, Hensley moved to suppress the statements he made to the New Hampshire State police and any evidence seized at the time of the interrogation and his arrest.[3] The motion was denied after an eviden-

---

[3]The physical evidence seized at the time was Hensley's clothing that he had been wearing before being admitted to Speare Memorial Hospital (hospital). There was evidence at trial that Hensley's blood was found on the sweatshirt he was wearing. See note 4, *infra*.

tiary hearing. In his memorandum of decision, the motion judge made extensive findings of fact, finding credible, and largely adopting, the testimony of New Hampshire State Police Sergeant Beausoleil, the only witness who testified at the hearing.

On the basis of his findings, all of which are supported in the testimony, the motion judge concluded that "[a]lthough [Hensley] was tired and upset about what had happened in his life and what he had done, I am convinced beyond a reasonable doubt that he fully understood his Miranda warnings and made a knowing, intelligent and voluntary waiver of those rights." The judge also found that Hensley understood that he was in custody under the IEH protocol, and concluded that this custody was lawful. The judge inferred that Hensley "wanted to speak with the officers and tell them his feelings and his version of the events. He did feel some genuine remorse about what had happened and he wanted to talk with the officers about this, even though he did not make a full confession." The judge noted that at no time did Hensley express a wish to stop talking with the officers, even though he was advised orally and in writing that he could do so at any time. The judge found that Hensley was an intelligent man who had no difficulty understanding the Miranda warnings and that the officers were calm and professional and exhibited no threatening or coercive conduct toward him. In sum, the judge found that Hensley's weariness and his mental and emotional distress did not deprive him of the ability to make a knowing, intelligent, and voluntary waiver of his Miranda rights, or a voluntary statement. Therefore, the judge concluded that Hensley's waiver and his statements were validly obtained and denied his motion to suppress the statements.[4]

Hensley argues on appeal that the decision denying his motion to suppress violated his constitutional right to a fair and impartial tribunal and was based on subsidiary facts unsupported in the record.[5] Hensley contends that the motion judge "oriented his decision around the presupposition that Mr. Hensley was guilty

---

[4] The judge also denied Hensley's motion to suppress the clothing that was seized when he was arrested. See note 3, *supra.* Hensley does not challenge the judge's ruling in this respect, and we perceive no error.

[5] As noted above, the judge's findings were fully supported by the testimony at the suppression hearing, which he credited.

of the murder of his wife," and that this prejudgment "informed the court's factual findings and conclusions of law." Specifically, Hensley points to the judge's reference to "what he [Hensley] had done," as indicative of the judge's prejudgment of Hensley's guilt in the death of his wife. Hensley also challenges the judge's conclusions that Hensley wanted to speak to the officers to "tell them his feelings and his version of the events," and that Hensley "did feel some genuine remorse." Hensley contends that these statements further indicate that the judge presumed Hensley's guilt.

"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). The Commonwealth bears the burden of proving beyond a reasonable doubt that a Miranda waiver was made voluntarily, knowingly, and intelligently. *Commonwealth* v. *Jones*, 439 Mass. 249, 256 (2003). The Commonwealth also bears the burden to prove beyond a reasonable doubt that the statements were made voluntarily. *Id.* "Although the validity of a defendant's Miranda waiver and the voluntariness of his statements are separate inquiries, we use a totality of the circumstances test for both." *Id.* at 257. Both the Federal and Massachusetts Constitutions guarantee a criminal defendant's right to a fair hearing before an impartial tribunal. See *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases"); art. 29 of the Massachusetts Declaration of Rights ("It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit").

There is no merit to Hensley's claim that he did not receive a hearing before a fair and impartial tribunal. Nothing in the record supports Hensley's claim that the judge improperly prejudged Hensley's guilt. Rather, the judge found facts and drew reasonable inferences based on Sergeant Beausoleil's testimony. The judge's reference to "what [Hensley] had done" may have simply been a reference to the suicide attempt, and not to his wife's murder. Even if the reference was to his wife's murder, the

judge did not presume Hensley to be guilty, but properly inferred that Hensley might have killed his wife based on Sergeant Beausoleil's testimony. Notably, Sergeant Beausoleil testified that Hensley was able to recount the events of January 31, 2002, with clarity up to the point when he was asked about whether he went into the house where his wife was. In addition, the fact that Hensley spoke to the officers despite being told that he had the right to remain silent, supported the judge's finding that Hensley wanted to speak to the officers to "tell them his feelings and his version of the events." Similarly, the judge's conclusion that Hensley felt genuine remorse about what had happened was supported by the evidence.

b. *Dr. Flomenbaum's testimony.* Dr. Flomenbaum testified that he was the chief medical examiner in Massachusetts, and that he had previously spent fourteen years working in the New York City medical examiner's office, where he became deputy chief medical examiner. Dr. Flomenbaum explained the function of the medical examiner's office and testified to his education, experience, and qualifications in the field of forensic pathology. He then explained the autopsy process, including the external and internal examination of the body and its organs, the documentation of that process, and the ultimate objective of the pathologist to render an opinion as to the cause of death.

Dr. Flombenbaum testified that Dr. William Zane performed the autopsy on February 1, 2002, and prepared an autopsy report. Dr. Flomenbaum indicated that he had Dr. Zane's autopsy report with him on the witness stand to refer to if necessary, and that before testifying, he reviewed Dr. Zane's autopsy report and supporting materials, including Dr. Zane's notes and photographs of the victim's body.[6]

Based on his review of these materials, Dr. Flomenbaum opined that the cause of death was "ligature strangulation," the "mechanism" being not so much "loss of air" as "blood starvation to the brain." Dr. Flomenbaum's opinion as to the cause of the victim's death was not contested at the trial.

Dr. Flomenbaum also testified on direct examination to many

---

[6]The Commonwealth did not offer the autopsy report in evidence. Defense counsel objected to all of Dr. Flomenbaum's testimony on the ground that he was not the medical examiner who had performed the autopsy.

of the specific findings made by Dr. Zane in the autopsy report, and to various conclusions regarding the length (from two to ten minutes) and nature of the "struggle" between the victim and Hensley that resulted in her death, including that abrasions on the victim's neck were likely caused by her fingernails in attempts to pull the ligature off during the strangulation. This testimony was the subject of vigorous cross-examination, and closing argument, on the issue whether the victim's death was the result of extreme atrocity or cruelty.

Hensley argues that the admission of Dr. Flomenbaum's testimony regarding the cause of the victim's death and the findings of Dr. Zane was both constitutional error, see *Crawford* v. *Washington*, 541 U.S. 36, 53-54 (2004) (confrontation clause prohibits admission of testimonial out-of-court statements unless declarant unavailable and defendant had prior opportunity to cross-examine declarant about statements), and violative of the Massachusetts law of evidence, see *Commonwealth* v. *Markvart*, 437 Mass. 331, 338 (2002) ("expert's direct examination may not be used to put before the jury facts that are not [and will not be] properly in evidence"). We conclude that while there may have been error in the admission of some of Dr. Flomenbaum's testimony, reversal of the conviction is not warranted.

First, there was no error in admitting the testimony of Dr. Flomenbaum regarding his opinion as to the cause of death. Dr. Flomenbaum appeared as a witness at the trial, opined as an expert on the basis of information on which experts ordinarily and may properly rely, and was subject to cross-examination. In this respect, the case is governed by *Commonwealth* v. *Nardi*, 452 Mass. 379, 387-391 (2008) (right of confrontation not violated where medical examiner who did not perform autopsy permitted to testify to his own opinion as to cause of death).[7] To the extent that Dr. Flomenbaum testified on direct examination to some of

[7]Hensley further claims that in light of *Crawford* v. *Washington*, 541 U.S. 36 (2004), in a criminal trial, an expert cannot base his or her opinion on the work of other experts who will not be called as witnesses. More specifically, Hensley contends that our ordinary rule regarding the proper basis for expert testimony, as set out in *Commonwealth* v. *Markvart*, 437 Mass. 331, 337 (2002), which includes "facts or data not in evidence if the facts or data are *independently admissible* and are a permissible basis for an expert to consider in formulating an opinion" (emphasis added) should now be interpreted to

the specific findings in the autopsy report (made by Dr. Zane) on which he based his opinion as to the cause of the victim's death, and such testimony may not have been admissible at that point in the trial, see *id.* at 391-394 (testifying medical examiner should not have been permitted to testify on direct examination to underlying findings in autopsy report prepared by another medical examiner), any such error was harmless where the cause of death was not a contested issue at trial.

To the extent that Dr. Flomenbaum's testimony was contested at trial, it was testimony that bore solely on whether the Commonwealth had met its burden of proving murder in the first degree under the theory of extreme atrocity or cruelty. Both defense counsel and the prosecutor specifically argued in their closings that that theory of murder relied on Dr. Flomenbaum's testimony regarding the length and nature of the struggle between the victim and Hensley. We need not parse the testimony on those points to determine how much of it was Dr. Flomenbaum's opinion (which would have been admissible), and how much was simply a reporting by Dr. Flomenbaum of Dr. Zane's findings and opinions,[8] because the issue has no bearing on Hensley's conviction of murder in the first degree on the theory of premeditation. On that theory, the closing arguments are also in agreement (and in agreement with the evidence) that the only issue for the jury was whether Hensley's mental health was so impaired that he lacked the capacity to premeditate the victim's murder, an issue that had nothing to do with the medical circumstances of her death beyond its uncontested cause (ligature

---

require that facts or data that are "independently admissible" actually must be admitted at trial through percipient witnesses in order to satisfy the defendant's right of confrontation. This view has been rejected by other courts, see *United States* v. *De La Cruz*, 514 F.3d 121, 134 & n.5 (1st Cir. 2008), cert. denied, 129 S. Ct. 2858 (2009), quoting *Crowe* v. *Marchand*, 506 F.3d 13, 17-18 (1st Cir. 2007) (medical examiner not precluded under *Crawford* from expressing opinion about cause of death based on factual reports prepared by another medical examiner who was unavailable to testify; expert reliance on reports prepared by other medical professionals "plainly justified in light of the custom and practice of the medical profession"). We reject Hensley's argument as well.

[8] Dr. Flomenbaum's testimony is unclear in this regard. With the laying of a proper foundation, it would have been permissible for Dr. Flomenbaum to testify as to his opinion with regard to the nature of the struggle that led to the victim's injuries, and the length of time it would likely have taken her to die as a result of those injuries. See *Commonwealth* v. *Avila*, *post* 744, 764-765 (2009).

strangulation). There was more than sufficient evidence to support Hensley's conviction of premeditated murder, and he does not contend otherwise. In these circumstances, we need not consider whether there was error that might have affected the jury's verdict under another theory of murder.[9]

c. *Motion for a new trial.* Represented by new counsel, Hensley filed a motion for new trial in August, 2006, arguing that his counsel had been ineffective at both the suppression hearing and the trial. In support of his motion, Hensley submitted medical records from the responding emergency medical personnel and the hospital relating to the night of his attempted suicide; medical records regarding care he received from 1999 to 2002 at the East Boston Neighborhood Health Center; and the New Hampshire State police investigation report. Hensley also submitted an affidavit from Dr. David Rosmarin, an expert psychiatrist who had been retained and consulted by Hensley's trial counsel, in which Dr. Rosmarin concluded that Hensley's ability voluntarily, knowingly, and intelligently to waive his Miranda rights the night of the attempted suicide was "severely impaired," and that Hensley's statements to the police that night were not voluntary because "his will was overborne" and his ability to avoid divulging information once the interrogation began was "severely weakened."[10] Dr. Rosmarin further concluded that at the time of the victim's killing, Hensley could not "conceive of killing Mrs. Hensley, weigh this decision even briefly, or act in furtherance of this weighing. Indeed, Mr. Hensley was unable to form the intent to kill or inflict grievous bodily harm because of his symptoms

---

[9]"The Commonwealth need prove only one theory of murder in the first degree. If a jury return a guilty verdict based on two theories, the verdict will remain undisturbed even if only one theory is sustained on appeal." *Commonwealth* v. *Nolin,* 448 Mass. 207, 220 (2007). See *Commonwealth* v. *Ellis,* 432 Mass. 746, 763 (2000) ("We need not consider the propriety of the judge's extreme atrocity or cruelty instruction where, as here, the jury rationally concluded that the defendant was guilty of felony-murder"); *Commonwealth* v. *Donahue,* 430 Mass. 710, 716 n.3 (2000) ("Because the jury were warranted in finding the defendant guilty of murder in the first degree on a theory of deliberate premeditation, we need not address the sufficiency of the evidence on which the defendant also was convicted on the alternate theory of extreme atrocity or cruelty").

[10]Dr. David Rosmarin cited the combined effects of Hensley's carbon monoxide poisoning, ingestion of sleeping pills, and "the cognitive impairments of [Hensley's] depression and the stress of the interrogation itself."

and mental impairments" at the time of the victim's murder. Dr. Rosmarin's conclusions were based largely on his diagnosis that at the time of the murder, Hensley suffered from "Major Depression Recurrent Type, Severe, with Melancholic Features"; chronic severe social phobia with frank panic symptoms; and that during the killing Hensley experienced a dissociative state.[11] In June, 2007, after a nonevidentiary hearing, the same judge who presided over Hensley's trial denied his motion for a new trial.

Because Hensley was convicted of murder in the first degree, we consider his claims of ineffective assistance of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, pursuant to G. L. c. 278, § 33E, which is more favorable to the defendant than the constitutional standard for ineffective assistance. "Thus, we consider whether there was error during the course of the trial, and, if so, whether the error was 'likely to have influenced the jury's conclusion.' " *Commonwealth* v. *Williams*, 453 Mass. 203, 205 (2009), quoting *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). "Under this more favorable standard of review, we consider a defendant's claim even if the action by trial counsel does not 'constitute conduct falling "measurably below" that of an "ordinary fallible lawyer." ' " *Commonwealth* v. *Williams*, *supra*, quoting *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992). "A strategic decision by an attorney, however, amounts to ineffective assistance 'only if it was manifestly unreasonable when made.' " *Commonwealth* v. *Williams*, *supra*, quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999).

(i) *Ineffective assistance at suppression hearing.* Hensley argues that trial counsel's failure to present evidence of Hensley's mental illness as it related to his ability voluntarily, knowingly, and intelligently to waive his Miranda rights and voluntarily make a statement to the New Hampshire State Police constituted ineffective assistance of counsel. Specifically, Hensley points to counsel's failure to introduce evidence that while Hensley was incarcerated in New Hampshire after his arrest, he was diagnosed with major depressive disorder, and counsel's failure to intro-

---

[11]Dr. Rosmarin also concluded that Hensley had the substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. "That is, in [Dr. Rosmarin's] opinion, he did not lack criminal responsibility for the killing."

duce Hensley's medical and psychiatric records or any psychiatric expert testimony.

There is no requirement that trial counsel always present expert or documentary evidence to support an argument, especially where other evidence is presented to support it. See *Commonwealth* v. *Medeiros*, 395 Mass. 336, 347 (1985) ("Although the evidence before the motion judge on the issue of the defendant's intelligence was insubstantial [and did not include expert testimony], we assume it entered into his evaluation of the totality of the circumstances"). The judge at the suppression hearing heard evidence that Hensley tried to kill himself by carbon monoxide poisoning on January 31, 2002; that he had allegedly ingested an entire bottle of sleeping pills that day; that he was the subject of an IEH at the time he spoke to the police; that he had said that he would kill himself if he were released from the hospital; that he repeatedly stated that he was depressed and had been depressed for some time; and that he said that his life was not worth living, as he had been living in turmoil. Trial counsel grounded his argument that Hensley's Miranda waiver was invalid and his statements were involuntary on this evidence at the hearing on the motion to suppress, and the motion judge fully considered Hensley's mental state in his decision. Trial counsel's decision not to present expert testimony at the hearing on this subject was plainly strategic. For example, if Dr. Rosmarin had testified, the prosecutor would have had a preview of his testimony, thus giving the prosecutor months to prepare for a careful cross-examination of Dr. Rosmarin at trial. Defense counsel's decision to proceed in this manner was not manifestly unreasonable.

Hensley argues further that counsel was ineffective because such evidence would have shown that his statements were involuntary in that his mental and physical condition rendered him unable to "protect himself" during the interview with the New Hampshire State police, citing *Pea* v. *United States*, 397 F.2d 627, 634 (D.C. Cir. 1968) (defendant's "statement does not reflect his own free will or intellect if his statement is attributable in critical measure to the fact that his self-protective mechanism is negated or overridden by external force or fraud, a condition of insanity, [or] the compulsion of drugs"). We disagree. Most significantly, Hensley was cognizant enough to

answer the officers' questions clearly and coherently up to the point that he was asked whether he entered 198 Byron Street or saw the victim on January 31, 2002. See *Commonwealth* v. *Paszko*, 391 Mass. 164, 178 (1984) (indication of defendant's ability to choose between speaking or remaining silent "is consistent with a rational intellect and indicates that the defendant's will was not overborne"). Indeed, Hensley never admitted entering the home or even seeing the victim, much less having killed her.

Finally, Hensley argues that his Miranda waiver was not voluntary, knowing, and intelligent because the New Hampshire State Police took advantage of Hensley's mental and physical condition by purposely deceiving him as to the nature of the interview. More specifically, Hensley contends that the police led him to believe that the interview related only to his detention under New Hampshire's IEH procedure for attempting suicide, but that the police in fact intended to (and did) question Hensley about the victim's murder, and that counsel was ineffective in failing to raise this issue.

We agree with the motion judge that counsel's failure to raise the issue of deception and misrepresentation by the New Hampshire State police at the suppression hearing did not amount to ineffective assistance. Hensley cites *Commonwealth* v. *Hosey*, 368 Mass. 571, 577 (1975), for the proposition that "[k]nowing what they did [about Hensley's mental and physical condition], the police should have been sensitive to whether the defendant was genuinely in a position to understand the significance of a waiver of his rights, in particular the importance of having a lawyer with him during the interrogation." However, the evidence at the suppression hearing demonstrated that the police were meticulous in ensuring that Hensley had the ability and capacity knowingly, voluntarily, and intelligently to waive his Miranda rights. The officers did not use trickery, deception, or any other unfair tactic to force or cajole Hensley into signing the waiver form or making a statement. The officers behaved in a calm, professional manner and demonstrated no threatening or coercive conduct.

Moreover, the fact that the police did not explain to Hensley at the outset that he was being questioned about the victim's

murder does not negate the validity of his Miranda waiver or the voluntariness of his subsequent statements. The police are not required to "inform a suspect of the nature of the crime about which he is to be interrogated." *Commonwealth* v. *Medeiros, supra* at 345. "Neither the subject matter of the questioning nor the defendant's status as a suspect has any bearing on whether the defendant understands that he need not answer the questions." *Commonwealth* v. *Raymond,* 424 Mass. 382, 393 (1997). "Our cases do not require that a defendant must have information regarding the crime about which he will be questioned or about police suspicions before making a valid waiver of his Miranda rights." *Id.* See *Commonwealth* v. *Hilton,* 443 Mass. 597, 606 (2005), quoting *Commonwealth* v. *Raymond, supra* ("In order for a waiver to be 'knowing' and 'intelligent,' the defendant must understand 'the [Miranda] warnings themselves,' but does not need to understand or appreciate the tactical or strategic consequences of waiving Miranda rights"). We have no doubt that Hensley understood that the police inquiry was criminal in nature, unlike the defendant in *Commonwealth* v. *Carp,* 47 Mass. App. Ct. 229, 234 (1999). Hensley was being questioned by two police officers, after having been informed of his Miranda rights because he was in custody, and Hensley was specifically told that he would be questioned about "his activities earlier in the day," meaning January 31, 2002. In these circumstances, defense counsel was not ineffective for failing to raise the issue of deception or misrepresentation at the motion to suppress, an argument that would have plainly failed.

(ii) *Ineffective assistance at trial.* Hensley argues that trial counsel's failure to present expert and documentary evidence of Hensley's mental impairment and the effect of that impairment on his capacity to form the states of mind required for murder in the first degree was constitutionally ineffective. More specifically, Hensley contends that his counsel was ineffective for failing to call Dr. Rosmarin, who would have testified (1) that Hensley suffered from a mental impairment that precluded his forming the mental states required for murder in the first degree by deliberate premeditation or extreme atrocity or cruelty, and (2) to Hensley's version of the events of January 31, 2002.[12] As

---

[12]Dr. Rosmarin's expert report included Hensley's version of the killing. The report indicates that Hensley's only plan when he went to 198 Byron

a result, Hensley maintains that the jury's verdict of guilty of murder in the first degree by deliberate premeditation was "pre-ordained" because defense counsel presented no evidence on which the jury could base a verdict of murder in the second degree.

The decision of trial counsel not to call Dr. Rosmarin was strategic, and we decline to characterize that decision as mani-festly unreasonable for several reasons. First, this is not a case in which trial counsel failed to investigate the possibility of a mental impairment defense. Contrast *Commonwealth* v. *Roberio*, 428 Mass. 278, 278-279 (1998) (trial counsel's failure to investigate defense of lack of criminal responsibility amounted to ineffective assistance). Trial counsel thoroughly investigated and proceeded with a defense of mental impairment to the charge of murder in the first degree. At his request, Dr. Rosmarin evaluated Hensley three times prior to trial for the purpose of forming an opinion as to his mental state at the time of the kill-ing, and Dr. Rosmarin was prepared to testify at trial on Hens-ley's behalf. If Dr. Rosmarin were to have testified, however, the Commonwealth could have presented its own evidence to

Street was to get the Buick and drive to New Hampshire to commit suicide. The Buick was not there when he arrived, so he went into the house to look at his home for the last time, and while he was inside he heard an automobile pull into the driveway. As the victim entered the house, Hensley hid in a second-floor "changing room" because he was afraid she would find him in the house. Hensley planned to "sneak out through the cellar . . . or go out the kitchen door." As he heard the victim's footsteps on the stairs, he "started really shaking and pushed [himself] in the corner." When she entered the changing room she asked, "What are you doing in the house?" She was angry and came toward Hensley, who put his hands on her shoulders to stop her, and the two fell. Hensley recalled "hearing noise, like horns from records, trumpets or something." The next thing Hensley remembered was kneeling next to the victim saying, "My hands didn't do this, my hands didn't do this." Hensley then put a tie around her neck because he "wanted to think that [the] tie did it instead of [his] hands." During a later examination, Hensley again recounted the events. He told Dr. Rosmarin that as he was waiting for the victim to come upstairs he was "afraid [he] might beat her up." Hensley grabbed her, they fell, and he started choking her, saying, "You destroyed me and my family." Hensley described himself as being in a "daze," "shaking," and "panicking." Hensley said, "It was like I wasn't there, but I was there. I can't even picture her face — I was too scared to look at her — looking away." When Hensley realized that she was dead, he thought about taking her with him to New Hampshire, but ultimately decided to leave her body in the base-ment bathroom in the hope that no one would find her there.

rebut Dr. Rosmarin's testimony at trial, cf. *Commonwealth* v. *Ostrander*, 441 Mass. 344, 351-355, cert. denied, 543 U.S. 867 (2004) (where defendant places at issue mental ability voluntarily to waive *Miranda* rights and make voluntary statement, defendant may be required to submit to examination to enable Commonwealth to rebut defendant's expert), and trial counsel was aware that the Commonwealth had retained its own expert to do precisely that.

Further, had Dr. Rosmarin testified, his conclusion that Hensley "did not lack criminal responsibility for the killing" would likely have been admitted in evidence, as would Hensley's description of what happened in the house at 198 Byron Street on January 31, 2002. It is not apparent that that description would have helped his cause: it included statements that would have bolstered the Commonwealth's theory that Hensley acted out of anger and with deliberate premeditation. For instance, Hensley related to Dr. Rosmarin that "I was going to tell [the victim] how angry I was that I had to kill myself. . . . I was afraid I might beat her up. . . . I grabbed her. . . . I started choking her. Saying, 'You destroyed me and my family.' I just choked her. . . . I was going to take my life and I blamed her for it." Trial counsel's decision not to call Dr. Rosmarin to avoid the risk that the jury would hear these statements is not manifestly unreasonable.

Additional unsympathetic facts also may have come to light had trial counsel presented Hensley's medical records. Although Hensley's medical records from the East Boston Neighborhood Health Center would have shown some history of anxiety and depression, they also would have shown that Hensley was greatly concerned that his depression medication was impairing his sexual performance. Those records also indicate that Hensley refused further counselling on occasion and that, although he had a generalized anxiety disorder, he showed no symptoms of depression during two separate visits. Moreover, the mental health evaluation that was performed while Hensley was incarcerated in New Hampshire found that although Hensley was suffering from major depressive disorder, there was "no evidence of thought disorder, delusions or hallucinations."

In light of the fact that Hensley's family and friends testified

at length about his severe depression, counsel was not ineffective for failing to introduce this additional evidence that may well have adversely affected the trial strategy, which was to portray Hensley as a suicidal, yet sympathetic family man. Indeed, counsel could reasonably have decided that Hensley's best chance to win the jury's sympathy was to rely on the testimony of his friends and family, who not only described Hensley's severe depression but also recounted his great allegiance to and love for his family and children.[13]

Ultimately, trial counsel correctly concluded that given all of the other evidence of Hensley's severe depression, he would receive a mental impairment instruction even without Dr. Rosmarin's testimony or Hensley's medical records. Trial counsel argued forcefully in summation that the jury should return a verdict of murder in the second degree because Hensley's mental impairment prevented him from forming the mental states required for murder in the first degree. Counsel reminded the jury that they had heard "compelling evidence of mental impairment [which] affects the state of mind, the intent." In these circumstances, trial counsel's decision not to call Dr. Rosmarin or present Hensley's medical records to avoid the risk that the jury would be exposed to potentially damaging evidence was not manifestly unreasonable. See *Commonwealth* v. *Frank*, 433 Mass. 185, 191-192 (2001) (trial counsel not ineffective for not presenting expert testimony regarding mental impairment caused by intoxication

---

[13]Contrary to Hensley's contention, this case is not akin to *Commonwealth* v. *Daniels*, 366 Mass. 601 (1975), where this court exercised its powers under G. L. c. 278, § 33E, and reversed a conviction of murder in the second degree "because no evidence was presented at the voir dire or at the trial to aid the trier of fact in evaluating the impact of custodial interrogation on [the defendant] in these circumstances." *Id.* at 608. The defendant in the *Daniels* case suffered from mental retardation, which bore significantly on his ability to waive Miranda rights and make a voluntary statement, and his confession provided the only evidence that he committed the crime. *Id.* The court concluded that "a substantial injustice may have been done to him because of the absence of expert testimony on the crucial issues of voluntariness and waiver" as well as the unexplained failure to present other, nonexpert evidence of the defendant's mental capacity at trial. *Id.* at 608, 609. Unlike the situation in *Daniels*, Hensley's trial counsel did present evidence of mental impairment, albeit through lay witness testimony. As explained above, trial counsel had good reasons for declining to call an expert or introduce Hensley's medical records. Thus, *Daniels* does not counsel for reversal in this case.

because counsel was concerned about potentially damaging cross-examination; counsel introduced evidence of defendant's state of intoxication through testimony of defendant and two other witnesses; and counsel argued issue forcefully to jury, and requested and received jury instruction on voluntary intoxication).

Finally, citing *Commonwealth* v. *Roberio*, 428 Mass. 278, 281 (1998), Hensley argues error in the denial of his new trial motion because the judge failed to "evaluate the defendant's evidence in the light most favorable to him to determine whether it might have influenced a jury's conclusion." We disagree. The motion judge in the *Roberio* case ruled that defense counsel was ineffective for failing to investigate a defense of lack of criminal responsibility, but went on to deny the defendant's new trial motion because the judge concluded that the defendant's expert was not credible, and thus the defense of lack of criminal responsibility was not likely to have influenced the jury's conclusion. *Id.* at 281. On appeal, this court held that "[i]t was error for the judge to deny the motion for a new trial based on his assessment of the expert's credibility." *Id.* at 281-282. "It was not proper for the trial judge, having found ineffective assistance for failure to raise that defense, to then remove the issue of credibility of that defense from the jury." *Id.* at 281. The situation here was different. Unlike in the *Roberio* case, the judge who heard the motion for a new trial did not decide that trial counsel was ineffective and then deny Hensley's motion based on a credibility determination. Rather, the judge determined that trial counsel was *not* ineffective because his tactical decision not to present expert and documentary evidence was not manifestly unreasonable. In analyzing the reasonableness of trial counsel's decision, the motion judge necessarily considered the negative consequences of presenting this evidence. This was entirely proper, and we have done the same on appeal. See *Commonwealth* v. *Anderson*, 398 Mass. 838, 843 (1986) ("The risk of the disclosure of negative information in [expert] reports was substantial if the experts had testified. Defense counsel had a tactical choice to make: whether to present an expert opinion that might raise a reasonable doubt on premeditation and extreme atrocity and cruelty at the risk of the disclosure of unfavorable information that would reflect adversely on the defendant and make less likely a sympathetic manslaughter verdict").

d. *Motion for expert witness funds.* To assist in preparing his motion for a new trial, Hensley moved for funds to retain an expert witness in psychiatry pursuant to Mass. R. Crim. P. 30 (c) (5), as appearing in 435 Mass. 1501 (2001). Hensley requested $6,000, but the judge allowed Hensley's motion "not to exceed $3,000." Hensley argues that the judge's decision was "arbitrary" and asks this court to approve the full amount of his request. We discern no abuse of discretion in the motion judge's decision and decline Hensley's request to approve a larger amount.

3. *Conclusion.* We have examined the record pursuant to G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the murder verdict, regardless of whether such grounds were raised on appeal. We conclude that the evidence supported Hensley's conviction of murder in the first degree, by reason of deliberate premeditation, and that there is no basis on which to reduce that verdict or order a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*